IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | § | |
| | § | |
| Defendant-Below, | § | |
| Appellant, | § | |
| | § | No. 232, 2018 |
| v. | § | |
| | § | Court Below: |
| JACQUEZ ROBINSON, | § | Superior Court |
| | § | of the State of Delaware |
| Plaintiff-Below, | § | |
| Appellee. | § | Cr. ID. No. 1411017691 A&B (N) |

Submitted: February 20, 2019
Decided: April 16, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices. Constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED in part, REVERSED in part, and REMANDED.**

Elizabeth R. McFarlan, Esquire, Department of Justice, Wilmington, Delaware for Appellant.

Patrick J. Collins, Esquire, Collins & Associates, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice, for the Majority:

## I. Introduction

In this case, we consider whether the State violated Jacquez Robinson's Sixth Amendment right to the effective assistance of counsel, and if we agree with the trial court that it did, whether the trial court erred in dismissing his indictment for first degree murder. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[1]  This right is "indispensable to the fair administration of our adversarial system of criminal justice."[2]  It "safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding."[3]  When the State deliberately invades that right, the integrity of the adversarial process is threatened.

On March 2, 2015, the State indicted Robinson on charges for his alleged involvement in separate shooting incidents on November 25 and 26, 2014, which left two people injured and one person dead.[4]  Charges related to the alleged assault on November 25th (the "Assault Case") were severed from the charges related to the alleged murder on November 26th (the "Murder Case").  The Superior Court scheduled the Murder Case for trial on July 11, 2017, but the court did not schedule the Assault Case for trial.

---

[1] U.S. Const. amend. VI.

[2] *Maine v. Moulton*, 474 U.S. 159, 168 (1985).

[3] *Id.* at 169.

[4] The charges consisted of: two counts of Murder First Degree, Robbery First Degree, seven counts of Possession of a Firearm During the Commission of a Felony, Conspiracy Second Degree, two counts of Reckless Endangering First Degree, and two counts of Assault First Degree, among other related charges.

Additionally, the State separately indicted Robinson in a multi-defendant action concerning his alleged participation in the "Touch Money Gang" (the "TMG Case"). That case had been scheduled for trial in October 2016.[5] Natalie Woloshin served as Robinson's counsel in all three cases.

On August 24, 2016, the Superior Court entered a protective order in the TMG Case (the "Protective Order").[6] The Protective Order prohibited Woloshin from giving Robinson any documents containing summaries and transcripts of witness interviews or documents containing identifying witness information. However, the Protective Order also permitted Woloshin to discuss the "content" of those documents with Robinson. Woloshin sought clarification from the State about her ability to discuss "content" on August 4, 2016. The State explained that it allowed her "to discuss/provide summaries of the materials under the protective order."[7] After another discussion between Woloshin and the State on August 22, 2016, Woloshin wrote to the State to memorialize her understanding of the Protective Order boundaries: "[t]he State takes the position that there is no violation of the protective order by me sending summaries of reports and transcripts of statements of

---

[5] That trial was continued, and it has since been stayed pending the outcome of the Murder Case.

[6] The Superior Court also entered a protective order in the Murder Case on June 12, 2017, which expired by its own terms on July 6, 2017. Only the TMG Protective Order, which was in effect during the time relevant here, is at issue on appeal.

[7] App. to Opening Br. at A40–41 (August 4, 2016 Emails between Woloshin and Deputy Attorney General Ipek Medford).

witnesses to my client so long as no identifying information is provided in the summaries. If this is not accurate, please let me know."[8]  The State did not respond.

Due to a May 2017 tip from an inmate housed in the same facility as Robinson, the two prosecutors assigned to the Murder Case, John Downs and Mark Denney, became concerned that Woloshin had violated the Protective Order.  On June 30, 2017, without notifying Woloshin, applying for a warrant, or otherwise seeking judicial guidance or approval, the State seized and reviewed all of the documents and notes in Robinson's cell—including his communications with Woloshin and personal notes containing trial strategy. When Woloshin learned of the search from Robinson nearly a week later, she notified the court and filed a motion to dismiss on July 7, 2017, arguing that the State had violated Robinson's Sixth Amendment right to assistance of counsel.

The Superior Court issued a Memorandum Opinion on September 19, 2017 (the "September 2017 Opinion"), setting forth the basic facts and legal framework for establishing a Sixth Amendment violation in this context and calling for an *in camera* review of Robinson's documents.[9]  The court then held hearings on October 25, 2017 and November 21, 2017, where the court heard testimony from most of the individuals involved in the June 30, 2017 search and seizure.[10]  In its May 1, 2018 opinion (the "May 2018

---

[8] *Id.* at A42 (August 22, 2016 Email from Woloshin to Deputy Attorney Generals Ipek Medford and John Downs).

[9] *See generally State v. Robinson*, 2017 WL 4675760 (Del. Super. Sept. 19, 2017) [hereinafter *September 2017 Opinion*].

[10] At the time of their testimony in this matter, John Downs was the Unit Head of the Homicide Division at the DOJ (App. to Opening Br. at A305), Mark Denney was a Deputy Attorney General (*id.* at A441), Joseph Grubb was the Chief Prosecutor for New Castle County (*id.* at A395), John Ciritella was the Chief Investigator for the DOJ Criminal Division (*id.* at A404), Jamie Prater was

Opinion"), the Superior Court held that the State had violated Robinson's Sixth Amendment right to the assistance of counsel, and it granted the motion to dismiss his indictment.[11] The State appealed.

## II. Factual Background[12]

In May 2017, an inmate incarcerated with Robinson wrote to the State claiming to have information relevant to the Murder Case. Downs interviewed the inmate on May 10, 2017. The informant-inmate stated that sometime in April 2017, Woloshin may have shown Robinson documents that were subject to the Protective Order. He also claimed that Robinson had used another inmate's pin number to call Woloshin regarding the protected documents. As a result, Downs and Denney became concerned that Woloshin may have violated the Protective Order. On May 16, 2017, Downs interviewed the inmate whose pin number had allegedly been stolen by Robinson to make phone calls, but the inmate denied allowing anyone to use his pin number for outgoing calls.

Beginning on June 9, 2017, Downs issued a series of subpoenas for Robinson's phone records. Each subpoena sought "any and all available approved phone number lists, outgoing call log entries and conversations."[13] Sometime before June 28, 2017, the

---

a paralegal assigned to the DOJ Homicide Unit (*id.* at A526–27), and Keith Marvel was a DOJ Special Investigator for the Criminal Division in Sussex County (*id.* at A587). Grubb, Downs, Denney, Ciritella, and Prater testified on October 25, 2017, and Marvel testified on November 21, 2017.

[11] *State v. Robinson*, 2018 WL 2085066, at *1 (Del. Super. May 1, 2018) [hereinafter *May 2018 Opinion*].

[12] We rely primarily on the Superior Court's findings in its September 19, 2017 and May 1, 2018 opinions, and on its findings in the 2017 hearings, unless otherwise stated.

[13] App. to Opening Br. at A51–52, A55 (State's June 2017 Subpoenas).

Delaware Department of Corrections ("DOC") produced recordings of Robinson's phone calls to the Delaware Department of Justice ("DOJ"). Thomas Dempsey, a DOJ investigator, listened to the recordings of Robinson's phone calls to determine if Robinson possessed material in violation of the Protective Order. The phone calls consisted of Robinson's conversations with his father, brother, and mother, and with three other individuals.[14] Dempsey provided transcripts of those calls to Downs and Denney on June 28, 2017. Additionally, the call logs revealed that someone had used the inmate's pin number to call Woloshin's office on three occasions.[15]

Until late June 2017, Downs and Denney coordinated the Protective Order investigation without establishing a "taint team."[16] Specifically, they "conducted interviews, issued subpoenas, listened to phone calls, and reviewed call logs."[17] It was not until June 28, 2017—less than two weeks before the July 11 murder trial—that Denney

---

[14] *See id.* at A131–53 (Call Transcripts).

[15] Downs testified that inmate calls to attorneys, including the calls to Woloshin's office, are not recorded. *See id.* at A328, A330–31 (Downs's Testimony). Downs and Denney later interviewed the inmate on June 30, 2017, who admitted that he allowed "Quez" or "Quiz" to use his number. Downs claimed that this interview was not for the Protective Order investigation. Rather, he stated that it was "to get information that could be used to attack the credibility of a prison informant, and to confront that with the records that we had, and to see whether he was going to change his story or not." *Id.* at A378.

[16] A taint team usually consists of colleagues of the government's prosecution team, such as agents and prosecutors. *See* Robert J. Anello & Richard F. Albert, *Government Searches: The Trouble with Taint Teams*, 256 N.Y. L. J. No. 108, 1 (2016). The taint team independently reviews and identifies documents protected by the attorney-client privilege to prevent the disclosure of privileged information to the prosecution team. *Id.*; *see also United States v. Neill*, 952 F. Supp. 834, 836–39, 841 n.14 (D.D.C. 1997) (noting that "at the very least, the 'taint team' procedures create an appearance of unfairness," but describing an extensive taint team procedure that satisfied Sixth Amendment concerns).

[17] *May 2018 Opinion*, 2018 WL 2085066, at *10.

and Downs alerted the Chief Prosecutor for New Castle County, Joseph Grubb, of their concerns. However, they did not inform Grubb that the State had previously clarified the parameters of the Protective Order for Woloshin. The same day that Downs and Denney raised their concerns, Grubb appointed Chief Special Investigator John Ciritella to coordinate the search of Robinson's cell.[18] Grubb and Downs met with Ciritella on June 28 or 29, 2017, where they instructed him to look for any documents in Robinson's cell that might suggest a violation of the Protective Order.[19] But they did not provide

---

[18] In its discovery material provided to Woloshin up to that point, the State had identified only one witness by name, and that witness was identified pursuant to the State's *Brady* obligations—in other words, that witness was likely exculpatory or helpful to Robinson. The State referenced the other witnesses only by using letter designations, and it redacted all other identifying information.

[19] According to Downs's testimony, the instructions that he and Grubb provided to Ciritella in their face-to-face meeting were limited. *See* App. to Opening Br. at A356–57 (Downs's Testimony) (Q: "So what do you recall telling Ciritella about items provided to Natalie Woloshin?" Downs: "That in the TMG case we had given witness statements, and that they were labeled by letters, like AA, BB, CC. And materials that had been provided and witness statements that had been provided relating to the Jacquez Robinson trial under a protective order."); *id.* at A379 (Q: "Was [Ciritella] provided copies of documents?" Downs: "I did not provide him with anything." Q: "Did you show him discovery letters?" Downs: "I did not. I just described it." Q: "[W]as there any email correspondence among you, Mr. Grubb, Ciritella regarding this topic of the investigation, that you know about?" Downs: "None that I am aware of." Q: "It was all just face-to-face meetings?" Downs: "Yes.").

Grubb's testimony revealed a similar lack of detailed instruction. *See id.* at A406–07 (Grubb's Testimony) (Q: "And did you provide instructions to Special Investigator Ciritella about what he was supposed to do in the investigation?" Grubb: "Yes. I asked him to coordinate the search of Jacquez Robinson's cell, to review the specific documents that may be violative of the protective order, and to let me know what he found. And most specifically, only tell me; leave Denney and Downs completely out of it for the reasons we have already discussed. I explained to him how we wanted to create that wall between what we were doing and the trial preparation for Jacquez Robinson's murder trial." Q: "And did you task him with going to the prison where Mr. Robinson was an inmate?" Grubb: "I didn't specifically task with him going to the prison, I just tasked him with leading the investigation. The nuts and bolts of how that occurs I leave to him."); *id.* at A409 (Q: "Before Special Investigator Ciritella reviewed the documents found in Mr. Robinson's cell, did you provide any parameters about what he was going to be looking for?" Grubb: "Well, yes. Like I said before, we are only looking for any document that would be in violation of the protective order with the witness identifiable information."). In fact, Grubb testified that he did

instructions regarding the attorney-client privilege or even limit the search to documents concerning witnesses.[20] In fact, Ciritella "understood that he was looking for attorney-client communications."[21]

On June 30, 2017, without contacting Woloshin, applying for a search warrant, or seeking judicial approval, Ciritella instructed the DOC to search Robinson's cell. That same day, DOC officers seized all documents and notes from Robinson's cell, placed them in garbage bags, and brought them to Ciritella in a conference room at the Sussex Correctional Institute.[22] Ciritella testified that, after emptying the bags onto the conference room table, he divided the pile of documents seized from Robinson's cell with Keith Marvel, a State investigator based in Sussex County, whom Ciritella had enlisted to help review Robinson's documents.[23] Marvel, like Ciritella, did not receive any training on the attorney-client privilege, nor did he even know that the search involved a potential protective order violation. According to Marvel, Ciritella informed him that they were looking for "written communication from [Woloshin's] office that w[ere] in the cell."[24]

---

not even instruct Ciritella to bring any questionable documents back to the DOJ in Wilmington. *See id.* at A433–34.

[20] *See id.* at A432 (Grubb's Testimony) (Q: "Before Ciritella obtained documents from the cell, did you give him any information about what would constitute protected attorney-client communications?" Grubb: "I did not, no.").

[21] *May 2018 Opinion*, 2018 WL 2085066, at *5. Although Grubb testified that he was "sensitive" to the attorney-client privilege, he admitted that "we were looking for documents that, according to the prison calls, came from his attorney." App. to Opening Br. at A405 (Grubb's Testimony).

[22] It is unclear whether the officers used one or multiple garbage bags. *Compare* App. to Opening Br. at A472–73 (Ciritella's Testimony) *with id.* at A595 (Marvel's Testimony).

[23] *See id.* at A471–72 (Ciritella's Testimony).

[24] *Id.* at A594 (Marvel's Testimony). At first Ciritella claimed that he did not look for, review, or read anything pertaining to Robinson's trial strategy or communications between Robinson and

8

Marvel also testified that "[a]nything that had a header of an attorney's office or was in an envelope of an attorney's office" is what he considered pertinent, which he then flagged for Ciritella's review.[25] Ciritella and Marvel testified that they kept virtually no record of the contents of the seized documents or how they went about reviewing the documents.[26]

Ciritella took "twelve manila envelopes and five letter-sized envelopes that all bore Defense Counsel's letterhead, as well as a larger envelope that contained a federal

---

Woloshin. *Id.* at A475 (Ciritella's Testimony). But he later admitted that he reviewed letters from Woloshin to Robinson, and that he took some of those letters back to Wilmington. *Id.* at A485, A512.

[25] *Id.* at A610, A613 (Marvel's Testimony). Marvel also clarified that he was looking for *any* attorney-client communications—not only those from Woloshin. *See id.* at A616 (Q: "So it was just attorneys, period, in the general sense, not a particular person?" Marvel: "That's the way I was doing it, yes.").

[26] *See id.* at A474 (Ciritella's Testimony) (Q: "Did you make a listing of each and every document that was provided to you from - - within that clear bag?" Ciritella: "No." Q: "And did you count and document the number of pages or papers that were provided in that bag?" Ciritella: "No."); *id.* at A486–87 (Q: "Were any of the documents that you reviewed photocopied?" Ciritella: "No, sir." Q: "[I]s there any other record of the documents, or copies of the documents themselves, that were retained by the [DOJ]?" Ciritella: "Not that I'm aware of."); *id.* at A504 (Q: "Out of the documents that you ended up taking out of the prison, did Marvel flag any of those documents?" Ciritella: "I don't recall. We were separating the documents, and then I had final, I guess, look-through to see what would be taken."); *id.* at A510 (Q: "What methodology did you use to go through all of those documents in an hour?" Ciritella: "Well, some of the documents could have been drawings, could have been religious materials. I didn't think that they would be breaking the protective order, so I pushed those to the side. Again, it was just sifting through documents that, you know, had been a part of a cell search before; again, looking to see what, maybe paperwork, would be that of importance."); *id.* at A516 (Q: "Did you and Marvel divide up the work in any particular kind of way in terms of, You take this stack of manila envelopes, and I'll take this other stack over here?" Ciritella: "No, sir, we did not." Q: "You just kind of divvied up the pile and went to work?" Ciritella: "Yes, sir."); *see also id.* at A596 (Marvel's Testimony) (Q: "And at the end of your time there that day, did you make any notes or write any documents pertaining to your activity that day?" Marvel: "I did not, no."). In fact, it appears that the only documentation of the first review is Ciritella's handwritten summary of documents seized and brought to Wilmington for additional review. *See id.* at A485 (Q: "Is this [located at A69–70] the sum and substance of your documentation of the tasks that Mr. Grubb assigned you with respect to Jacquez Robinson's cell?" Ciritella: "That is correct.").

transcript and pages of Defendant's handwritten notes, and brought them back to the DOJ in Wilmington for further review."[27] At the DOJ, Grubb did not set up a taint team at this point to review the seized documents, but instead selected Jamie Prater to review them. Prater testified that Grubb did not instruct her regarding what to review and she was not instructed by anyone to avoid privileged material.[28]

Prater, a paralegal assigned to the Murder and TMG Cases, was integral to Robinson's prosecution team. According to Downs, she "controlled the paperwork flow," "kept record of what was sent out," "would redact the statements that we wanted redacted," and "would prepare discovery as it would go out, and present that to us to be sent to defense counsel."[29] And according to Denney, Prater "had to do some heavy lifting to organize the voluminous discovery," and "she assisted in scheduling all of [the State's] witness interviews."[30] Similarly, Prater testified that she generally helps schedule witness interviews and in-court appearances, and sometimes even has direct contact with

---

[27] *See May 2018 Opinion*, 2018 WL 2085066, at *5. Ciritella testified that he gave DOC officers the remaining documents to return to Robinson's cell. App. to Opening Br. at A476 (Ciritella's Testimony).

[28] *See* App. to Opening Br. at A533 (Prater's Testimony) (Q: "And were you provided any instructions, other than Mr. Ciritella's request of you, as to what you were looking for in the documents that he presented you with in that conference room?" Prater: "I was not provided with any direct instructions, besides that there was a potential violation of a protective order, and I should figure out if we have anything that shows that."); *id.* at A556 (Q: "Before you start your review of the documents, were you instructed by anyone to avoid confidential attorney-client communications?" Prater: "I was not. . . ." Q: "How about defense work product?" Prater: "I was not.").

[29] *Id.* at A341–42 (Downs's Testimony). *See also id.* at A364–65 (Q: "Would it be fair to say that [Prater] was kind of the person on your team who marshaled all of the discovery, and disclosures, and things like that?" Downs: "Yes.").

[30] *Id.* at A454–55 (Denney's Testimony).

witnesses.[31]  However, she could not remember whether she helped draft the witness list in the Murder Case.[32]  Additionally, Denney testified that Prater would sometimes sit in prosecution strategy meetings to talk about the case.[33]  Indeed, Grubb testified that it was because of Prater's intimate involvement with the case that Grubb assigned her to the review.[34]

On June 30, 2017, Prater reviewed Robinson's documents in the seventh floor conference room at the DOJ in Wilmington—the same floor that, according to Ciritella, housed offices for all prosecutors and investigators in the Wilmington office.[35]  When the documents were not in the conference room for review, Ciritella testified that he secured the documents in his office, and that there was no evidence that anyone had tampered with or broken the lock.[36]  Like Ciritella and Marvel, Prater testified that she did not record or inventory what she reviewed.[37]

---

[31] *Id.* at A554 (Prater's Testimony).

[32] *Id.* at A564.

[33] *Id.* at A456–57 (Denney's Testimony).

[34] *See id.* at A409–10 (Grubb's Testimony) (Q: "[W]hen Special Investigator Ciritella reported back to you that he didn't think anything violated the protective order, but he wasn't sure about some, did you make the decision to involve Miss Prater?"  Grubb: "Yes, we did.  In my opinion, she knew the material best in the sense that I couldn't go to Denney or Downs.  And I could take a look, but I wouldn't really know either.  Ciritella was in a better spot than me.  So the thinking was Jamie Prater was in the best spot to be that second layer of review.").

[35] *See id.* at A465–66, A516 (Ciritella's Testimony).

[36] *Id.* at A487.

[37] *See id.* at A534 (Prater's Testimony) (Q: "Did you make any notes of any of the documents that you reviewed?"  Prater: "I did not."  Q: "Did you make an inventory of what it was you reviewed?"  Prater: "I did not.");  *id.* at A536 (Q: "Did you take any notes of the substance of any of those letters [to and from Woloshin]?"  Prater: "I did not.").

11

Based on the Superior Court's findings from its *in camera* review, the seized documents included privileged attorney-client communications and Robinson's handwritten notes containing trial strategy.[38] The court's findings were consistent with Robinson's motion to dismiss, in which he claimed that the content of the documents included "Counsel's assessment of the State's case; persons who were interviewed and the content of their statements, and legal strategies," and "a folder of notes that Mr. Robinson kept that memorialized his communications with legal counsel and legal research he conducted at the prison law library."[39] Prater likewise testified that she reviewed handwritten notes on a yellow legal pad and loose papers, which, she admitted, reflected information that Robinson received from Woloshin.[40] By reviewing those documents, Prater "learned details of Defendant's defense strategy."[41] Ultimately, however, Prater

---

[38] The State has explained that it did not dispute in the record or at oral argument that the documents it seized contained trial strategy because it declined the opportunity to review Robinson's documents during the hearings below. *See id.* at A574 (October 25, 2017 Hearing) (The court: "[D]oes Mr. Lugg get the opportunity to see what I am seeing [in the *in camera* review], or - - " The State: "For the reasons stated now, as to seeing it, I would not want to see that because . . . I would not want to see something in my role that would be somehow a privileged or confidential communication."); Oral Argument Video at 20:52–21:24, https://livestream.com/DelawareSupremeCourt/events/8570210/videos/187665632 (The Court: "Does the State dispute the finding of the trial court that the documents that were reviewed did in fact disclose trial strategy?" The State: "We do not. We affirmatively chose not to see those documents at all . . . so that he could go forward with a fair trial without any possibility of further taint. We elected not to see them.").

[39] App. to Opening Br. at A96 (Robinson's Motion to Dismiss).

[40] *Id.* at A538–42, A568–69 (Prater's Testimony) (Prater: "The notes that I remember reviewing at the time that I wrote this [July 5, 2017] e-mail did not involve Miss Woloshin. They were notes of, I assume, Mr. Robinson. They didn't mention Miss Woloshin or her co-counsel." The Court: "But you concluded that the notes reflected information he received from her?" Prater: "Yes. That was . . . my conclusion."). Prater also testified, however, that she did not note or retain the substance of Robinson's notes. *Id.* at A539, A541–42.

[41] *May 2018 Opinion*, 2018 WL 2085066, at *1.

concluded from her review that Robinson was not in possession of any documents prohibited by the Protective Order.[42]

On July 1, 2017, the day after Prater's review of Robinson's documents, she emailed Grubb suggesting that they return the documents to Robinson.[43] Grubb replied and said that her suggestion made sense, but no one at the DOJ or DOC had notified Woloshin or the Superior Court of the State's investigation.[44] Rather, on July 5, 2017, Robinson notified Woloshin that the DOC had seized his legal papers. Woloshin emailed Judge Parkins that same day to notify him that the DOC had seized "all correspondence from Counsel, motions sent to him and a notebook that he kept to memorialize conversations with counsel

---

[42] In an email to Grubb on July 5, 2017, Prater described her findings:

> Mr. Robinson was in possession of co-defendant transcripts, which he is entitled to. There were no witness transcripts or police reports in Mr. Robinson's possession at the time that the search was conducted. However, there was one copy of a two page redacted FBI report in Mr. Robinson's possession as well as several pages of hand written notes detailing specific facts, witness statements, and other evidence all of which could have only been obtained via the police reports. It is my conclusion that Ms. Woloshin shared the redacted police reports with Mr. Robinson. The redacted police reports were not under protective order however, as the State always does, we had asked Ms. Woloshin not to share the redacted police reports with her client, she did so anyways.

App. to Opening Br. at A89. Prater testified that she did not provide her written findings until five days following her review because four of the intervening days consisted of the weekend, a personal vacation day, and Independence Day, a State holiday. *Id.* at A544 (Prater's Testimony).

[43] *See id.* at A73 (July 1, 2017 Email between Prater and Grubb).

[44] *See id.* at A423–24 (Grubb's Testimony) (Q: "Did you consider asking Miss Woloshin about the issue?" Grubb: "Yes, I considered it." Q: "Why didn't you?" Grubb: "Miss Woloshin's conduct was at the heart of the potential protective order violation. I didn't think it would be fruitful in bringing it to her attention if she was, in fact, violating protective orders as Jacquez Robinson said in his calls." . . . Q: "Did you consider bringing the issue to the trial judge's attention?" Grubb: "I did. I thought it was premature to do that because, at this point in time . . . we had concerns. But until we have reviewed the documents, I didn't think they were substantiated concerns.").

and legal research at the prison library."[45] She also asserted in that initial communication that "the actions of DOC violate Mr. Robinson's right to counsel under both the Delaware and federal constitutions," and she requested that the court "take action in order to protect Mr. Robinson's right to counsel."[46]

Within an hour of Woloshin's email, Grubb emailed Downs and Denney to say that Ciritella was supposed to have returned the documents two days earlier on July 3, 2017, but wrote, "I heard he is back tomorrow when the items will be returned."[47] The next day, on July 6, 2017, Woloshin sent a follow-up letter to Judge Parkins reiterating the points in her July 5 email and attaching a proposed order to require the DOC to return Robinson's material. Additionally, and separate from the confiscation of Robinson's documents, Woloshin raised concerns about Robinson's housing status leading up to trial. Judge Parkins responded within an hour at about 1 p.m., stating that he needed a response from the State by noon the next day, July 6, 2017.[48]

Prompted by Judge Parkins's email, Downs emailed Grubb, who in turn emailed Ciritella, to follow-up on the status of Robinson's documents. Ciritella responded at about 2 p.m. that the documents would be sent to Deputy Warden Truman Mears at Sussex Correctional Institute that afternoon. He also stated that Deputy Warden Mears was "aware of [the] investigation and has made the proper contacts for the internal delivery" to

---

[45] *Id.* at A71 (July 5, 2017 Email to Judge Parkins).

[46] *Id.* at A71–72.

[47] *Id.* at A73 (July 5, 2017 Email from Grubb to Downs and Denney).

[48] *See id.* at A111 (July 6 Email from Judge Parkins to the Parties).

Robinson.[49]  Downs then responded to Grubb, stating that the return of documents should be done "[a]s soon as possible."[50]

On the morning of July 7, 2017, Ciritella reported that the documents had been dropped off at Sussex Correctional Institute with Deputy Warden Mears.[51]  Grubb forwarded Ciritella's status update to Downs within a few minutes.  Downs then asked Grubb whether Deputy Warden Mears knew that the materials "should be returned ASAP," and Grubb replied: "[H]e does.  I asked Ciritella to make sure everything got back to Robinson immediately.  I told [Deputy Attorney General] Greg Smith the same thing last night.  I cannot confirm Robinson has the material, but I can confirm we relayed the importance."[52]  Downs then emailed Judge Parkins at 9:55 a.m. the same morning.  His single-sentence email stated: "I have been advised that materials taken from Robinson's cell has [sic] already been or will be returned to him today."[53]  Separately, Smith responded on behalf of the DOC confirming that it had seized materials from Robinson's cell, including legal materials, and that the DOC had returned all of those materials between

---

[49] *Id.* at A74 (July 6, 2017 Email between Ciritella to Grubb, Dempsey, and Prater).

[50] *Id.*

[51] *Id.* at A77 (July 7, 2017 Email from Ciritella to Grubb, Dempsey, and Prater).

[52] *Id.* at A84 (July 7, 2017 Email from Grubb to Downs).  In a separate email to Smith on July 6, 2017, Ciritella likewise explained to Smith that he would be dropping the documents off personally (rather than sending them) and that they should be returned to Robinson as soon as possible.  *Id.* at A87–88.

[53] *Id.* at A114 (July 7, 2017 Email from Downs to Judge Parkins, and copying Woloshin).  Downs testified that he thought Grubb may have also responded separately, but he did not know.  *See id.* at A353–55 (Downs's Testimony).  Grubb did not testify to this point, nor is there any correspondence in the record suggesting that he responded to Judge Parkins.

15

July 6 and July 7, 2017.[54]  Thus, the State "remained in possession of [Robinson's] legal documents until four days before trial was scheduled to begin, despite having no evidence that [Robinson or his counsel had] engaged in any wrongdoing."[55]

Meanwhile, following her review, Prater continued her involvement in final trial preparations, and the prosecution team continued to copy her on emails regarding witnesses and evidence for trial.[56]  In fact, Downs did not officially remove Prater from the prosecution team until July 14, 2017, after the Superior Court had continued the trial.[57]  Although she had been removed from the Robinson prosecution team, Prater testified that she continued to work with Downs and Denney on other murder cases.[58]

Robinson moved to dismiss his indictment on July 7, 2017, arguing that the seizure of his legal documents violated his Sixth Amendment rights.

---

[54] *See id.* at A117–18 (July 7, 2017 Letter from Deputy Attorney General Gregory E. Smith).  This letter also addressed, in more detail, the issues concerning Robinson's housing that Woloshin raised in her July 6, 2017 email and letter, which are unrelated to this appeal.

[55] *May 2018 Opinion*, 2018 WL 2085066, at *13.

[56] The State disputes this finding and contends that Prater did not actively participate in the trial preparation after her review.  Oral Argument Video at 2:10–2:29, https://livestream.com/DelawareSupremeCourt/events/8570210/videos/187665632.  Prater testified that she was in "limbo" for a few days after the review of Robinson's documents and that she did not do any work on the Robinson case because there was not much left to be done so close to trial.  App. to Opening Br. at A546–47.

[57] *See May 2018 Opinion*, 2018 WL 2085066, at *6.

[58] App. to Opening Br. at A556 (Prater's Testimony).

16

A.    *The September 19, 2017 Decision*

The Superior Court issued a preliminary Memorandum Opinion on September 19, 2017, to explain the framework for assessing whether the State violated Robinson's Sixth Amendment rights.[59]  Specifically, the court evaluated the impact of three significant Sixth Amendment cases in the context of privileged communications: *Weatherford v. Bursey*,[60] *United States v. Levy*,[61] and *United States v. Morrison*.[62]

The Superior Court concluded that, under the United States Supreme Court's decision in *Weatherford,* "there must be a showing that Robinson suffered prejudice as a result of the warrantless seizure of his legal materials from his cell to establish that there was a Sixth Amendment violation."[63]  Despite suggestions in various cases that the Supreme Court's decision in *Morrison* had called into question the Third Circuit's decision in *Levy*, the Superior Court held that "[p]rejudice can only be presumed under *Levy* if there was actual disclosure of Robinson's defense strategy to the prosecution team."[64] Additionally, the court held that it "may find that there was a Sixth Amendment violation if there was a deliberate attempt to interfere with Robinson's attorney-client

---

[59] *See September 2017 Opinion*, 2017 WL 4675760 at *1–*6.

[60] 429 U.S. 545 (1977).

[61] 577 F.2d 200 (3d Cir. 1978).

[62] 449 U.S. 361 (1981).

[63] *September 2017 Opinion*, 2017 WL 4675760, at *6.

[64] *Id.*

relationship."[65]  If Robinson could not establish that there was a disclosure of his defense

strategy or a deliberate attempt to interfere with his attorney-client relationship, then he

would have the burden to show prejudice.[66]  Finally, the court ordered an *in camera* review

of the documents that the State had seized from Robinson's prison cell.

## B.   *The Hearings in October and November of 2017*

Following its September 2017 Opinion and prior to conducting its *in camera* review,

the Superior Court held a hearing on October 25, 2017, to hear testimony from the State's

witnesses—Downs, Denney, Grubb, Prater, and Ciritella—and to clarify which documents

were seized and reviewed.[67]  During the October hearing, the court learned that the State

had failed to properly produce its emails or identify Marvel as one of the individuals who

reviewed Robinson's documents.  Thus, the court ordered a second document production

and a second hearing, which took place on November 21, 2017.

### 1.   *The State's Deficient Discovery Responses*

During the October hearing, the Superior Court questioned why the State had not

previously disclosed Marvel's involvement in the review of Robinson's documents:

> How come Keith Marvel has not been identified prior to today as one of the
> people who reviewed the documents, when I had specifically identified the
> scope of inquiry that I wanted to hear from all of the people who reviewed
> the documents, and Joe Grubb testified today that the only people that had
> access to the documents were Jamie Prater, himself, and John Ciritella.  That
> now turns out to be inaccurate. . . .  Mr. Grubb was asked specifically on

---

[65] *Id.*

[66] *Id.*

[67] *See* App. to Opening Br. at A287 (September 26, 2017 Office Conference Transcript).  Sean Lugg and Carolyn Hake conducted direct examination for the State, and Patrick Collins, as Robinson's counsel, cross-examined the State's witnesses.

Direct Examination and on Cross who had access to the documents. He did not identify Keith Marvel. . . . But now we know that is not correct. Now we know Keith Marvel did review the documents.[68]

In response, the State claimed it was unaware until Ciritella's testimony that Marvel had reviewed the documents.[69] The record indicates that even Grubb may have been unaware that Marvel reviewed the documents, although he never expressly testified on that point.[70]

The court also learned that the State had not properly searched and produced its emails.[71] The court discovered this shortcoming through Prater's testimony, where she stated that she had not searched her emails for correspondence or memoranda relevant to the review of Robinson's documents—even though she admitted that there may have been

---

[68] *See id.* at A505–07 (October 25, 2017 Hearing). In addition to his testimony, Grubb's July 10, 2017 affidavit does not mention Marvel as a person who was involved in the search or had access to the seized documents. *Id.* at A128.

[69] *Id.* at A506–07 (State Prosecutor Sean Lugg: "I can say this, I asked, in speaking with the witness for his preparation, Officer Ciritella about Marvel's involvement. Until today his involvement was to accompany Mr. Ciritella to the facility. But his assistance was not to the level of reviewing documents. That's what we heard today. So that's the best I could tell you.").

[70] Grubb and Ciritella both testified consistently with the State's position. *See, e.g.*, *id.* at A407 (Grubb's Testimony) (Q: "And did you task him with going to the prison where Mr. Robinson was an inmate?" Grubb: "I didn't specifically task with him going to the prison, I just tasked him with leading the investigation. The nuts and bolts of how that occurs I leave to him."); *id.* at A503 (Ciritella's Testimony) (Q: "Who directed Sergeant Marvel what to do?" Ciritella: "That was me." Q: "So he did not participate in any briefings with Mr. Grubb or any prosecutor?" Ciritella: "No, sir."). Carolyn Hake, counsel for the State, also told the court that she had asked Grubb about Marvel's involvement, but that from her understanding, Grubb did not think that Marvel had reviewed Robinson's documents. *See id.* at A507.

[71] *Id.* at A576–77 (October 25, 2017 Hearing) (Judge Rocanelli: "But the other piece of information that surprised me today was Miss Prater's testimony that she had not done an e-mail search, and that she had not been asked to do a[n] email search. I think that is inconsistent with what my expectations were, because Mr. Collins, I think, made a request for documents. . . . [T]he Court expected that the State would produce all of the documents responsive to Mr. Collins's requests.").

19

relevant emails with Grubb and Ciritella.[72] Prior to the October hearing, the State had only produced three emails, which it uncovered from individual email searches by Grubb, Prater, and Ciritella of their own accounts.[73]

On November 7, 2017, the Superior Court instructed the State to "conduct a statewide document and email search for any documents and/or email messages addressing in any manner the search and seizure and/or the review of Defendant's documents as well as any staffing changes that occurred as a result thereof, and shall produce those documents and email messages . . . ."[74] In a November 16, 2017 letter, the State replied that it had conducted a two-prong search. First, it requested "each of the individuals involved in this matter (Messrs. Downs, Denney, Grubb, Ciritella, Dempsey, and Ms. Prater) to provide any identified electronic files."[75] Second, the State represented that the Delaware Department of Technology and Information ("DTI") searched and produced emails "from the accounts of [Downs, Denney, Grubb, Ciritella, Dempsey, and Prater] that may meet the criteria set by the Court."[76] For the individually-conducted searches, the State reported that

---

[72] *See id.* at A551–52 (Prater's Testimony) (Q: "Have you searched through your e-mails to determine if any other e-mails, memos, correspondence exists about the Jacquez Robinson document preview [sic]?" Prater: "I have not." Q: "Could there potentially be e-mails between you and Mr. Grubb about this topic? . . ." Prater: "There could potentially be." Q: "How about with you and Mr. Ciritella?" Prater: "[T]here could potentially be.").

[73] *See* App. to Answering Br. at B58–59 (November 16, 2017 Letter from State to Judge Rocanelli) ("Pursuant to [the court's August 21, 2017 order], Mr. Grubb reviewed his electronic files and instructed Ms. Prater and Mr. Ciritella to do the same. Three emails were identified and provided to Mr. Collins . . . .").

[74] *Id.* at B56 (November 7, 2017 Letter from Judge Rocanelli to Counsel).

[75] *Id.* at B59 (November 16, 2017 Letter from State to Judge Rocanelli).

[76] *Id.*

20

"no qualifying files were identified."[77] However, "a review of the emails provided by DTI revealed" approximately thirty-seven relevant emails.[78]

It appears from the State's November 16 letter that the State did not include Marvel's email account in its search and production. The court had ordered a "statewide" search of any relevant material, not merely a search of those six accounts. On November 21, 2017, the Superior Court heard Marvel's testimony and closed the evidentiary record.

### 2. *The State's Testimony Concerning the Possibility of "Taint"*

In the October and November hearings, the witnesses testified concerning whether the contents or substance of the documents had been disclosed to Downs and Denney, or to other individuals outside of those involved with the Protective Order investigation. Overall, the weight of the evidence suggests that Robinson's privileged information was not divulged to those involved with the Murder Case, other than Prater. We summarize the record next.

Downs and Denney testified that neither Prater nor Ciritella shared information about the review with them.[79] Additionally, they broadly testified that they did not hear

---

[77] *Id.*

[78] *Id.* at B59–60.

[79] *See* App. to Opening Br. at A343 (Downs's Testimony) (Q: "Has [Prater] provided you any information based upon anything that she did with respect to that portion of the case?" Downs: "No."); *id.* at A344–45 (Q: "Has [Ciritella] provided any information to you following [the search of Robinson's cell]?" Downs: "No." Q: "Did he even tell you whether he did or did not do that?" Downs: "He did not, no." Q: "And has he had any involvement in the investigation of the prosecution cases that you have described?" Downs: "No, he has not been involved in the active New Castle City case, the TMG case, or the severed Browntown shooting.").

*See also id.* at A449 (Denney's Testimony) (Q: "And has [Prater] ever communicated - - are you aware that she reviewed any documents that were found in Mr. Robinson's cell?" Denney: "I do know that she was one of the people that looked at the documents." Q: "And has she ever

21

about the contents of Robinson's documents from any other source.[80]  That testimony was consistent with the affidavits that Downs and Denney filed on July 10, 2017, in which both prosecutors stated that they were not involved in the search of Robinson's cell, had not been told about or seen the contents of anything found in Robinson's cell, and did not know the status of the investigation beyond their initial involvement.[81]

---

communicated anything to you concerning her review of the documents?"  Denney: "[N]ot at all."  Q: "And has Special Investigator Ciritella ever communicated anything to you?"  Denney: "No, he has not.").

[80] *See id.* at A339–40 (Downs's Testimony) (Q: "And the next line, Paragraph 7 [of Downs's affidavit], indicates that you were not involved in the planning, preparation, or execution of the search of Mr. Robinson's cell.  Is that true?"  Downs: "That's true."  Q: "And finally, have you been told about any of the information that was gathered from Mr. Robinson's cell; either what was gathered, or the substance of anything that was gathered from his cell?"  Downs: "No. . . ."  Q: "And, in fact, the final paragraph indicates you have no knowledge of the status of that investigation; is that correct?"  Downs: "That's correct."  Q: "Other than sitting here today, knowing that this is - - somehow relates to that, do you have any other knowledge about the status of that investigation?"  Downs: "No, I do not.").

*See also id* at A447–48 (Denney's Testimony) (Q: "And after you met with Mr. Grubb, were you provided with any further information by anyone about the status of the investigation into possible violations of the protective order?"  Denney: "No.  I remember having an additional quick conversation with Joe Grubb after - - I was copied on an e-mail that Ciritella had sent out, and I went down to Joe's office when I saw that e-mail and told him, like, I got copied on something from Ciritella, and he essentially said, I'll handle it.  Other than that, no[.]  Not involved in planning, preparation, or execution of the search. . . ."  Q: "And has anyone told you about the contents of anything that was found in Mr. Robinson's cell?"  Denney: "No, not at all."  Q: "And have you seen anything that was found in Mr. Robinson's cell?"  Denney: "No, not at all.").  The record indicates that the email on which Ciritella copied Denney was for scheduling purposes with the DOC.  Further, Ciritella testified that it was the only email on which he copied Downs or Denney because Grubb re-instructed him not to include them in anything concerning the review.  *See id.* at A470 (Ciritella's Testimony).

[81] Specifically, Downs and Denney stated in their affidavits that they were "not involved in the planning, preparation or execution of the search of Jacquez Robinson's cell," had "not been told of, nor have [they] seen, the contents of anything that was found in Jacquez Robinson's cell," and they "have no knowledge of the status of the investigation into the violation of the Court Protective Order," beyond the initial investigation prior to the search of Robinson's cell.  *See id.* at A120–21 (Denney's July 10, 2017 Affidavit), A122–23 (Downs's July 10, 2017 Affidavit).

Of those actively involved with the investigation after June 28, 2017, Ciritella and Marvel testified that they did not share information with Downs or Denney, or with anyone else generally.[82] Ciritella and Marvel further testified that they no longer remembered the substance of Robinson's documents.[83]

The questioning and testimony of Grubb and Prater was less thorough than the questioning of Downs, Denney, Ciritella, and Marvel. First, Grubb was not asked whether he shared information about the review with anyone, nor did he address that question in his affidavit.[84] Rather, he testified that he did not review the documents and that neither

---

[82] *See id.* at A486 (Ciritella's Testimony) (Q: "Did you, following the work that you did on the 30th of June, that Friday, did you adhere to the instructions that Mr. Grubb gave you to not speak to anyone about this case?" Ciritella: "That's correct, I did." Q: "And, particularly, did you speak with either Mr. Downs or Mr. Denney about anything that you did with respect to Mr. Robinson's cell?" Ciritella: "No, sir, I did not.").

*See also id.* at A597–99 (Marvel's Testimony) (Q: "Were you provided any directions or instructions as to who you could or could not speak to about the things you were doing on the 30th?" Marvel: "I was told by Mr. Ciritella that it was a sensitive investigation and I was not to discuss it." Q: "Okay. With anybody?" Marvel: "With anyone, yes." Q: "Have you discussed what you did on the 30th with anyone?" Marvel: "No." Q: "Have you discussed the substance of any documents you reviewed?" Marvel: "No. . . ." Q: "Did you speak to [Downs or Denney] at any point about this?" Marvel: "No. . . ." Q: "Did you ever speak to Jaime Prater about what you did on the 30th?" Marvel: "No. . . ." Q: "How about Joseph Grubb? Did you speak with him about your work in this matter?" Marvel: "Prior to or . . ." Q: "Prior to. Let's start with that." Marvel: "No." Q: "How about after?" Marvel: "Just to be here today." Q: "Okay. You testified that you haven't talked about your activity at SCI regarding Mr. Robinson's case with anyone; do I have that right?" Marvel: "Correct.").

[83] *See id.* at A523 (Ciritella's Testimony) (Q: "And, as you sit here today, do you have any independent recollection of the substance of either set of documents that you were reviewing with Miss Woloshin's letterhead?" Ciritella: "No, sir, I do not."). *See also id.* at A596 (Marvel's Testimony) (Q: "Were you or did you read the material that you were working through for substance?" Marvel: "I did not, no." Q: "Do you recall the substance of any of the documents that you were looking through that day?" Marvel: "I don't, no.").

[84] *See id.* at A124–29 (Grubb's July 10, 2017 Affidavit).

23

Ciritella nor Prater informed him of the substance of the documents.[85]  But there is an inconsistency in the testimony that the Superior Court did not resolve.  Ciritella testified that, upon Prater's request, he brought Robinson's documents from his office to the seventh floor conference room so that Grubb could review them himself.[86]  Ciritella also testified that, to the best of his knowledge, Grubb actually reviewed the documents.[87]  Further, Grubb's July 10, 2017 affidavit is silent as to whether he reviewed the documents.[88]  Prater's testimony, however, directly contradicted Ciritella's claim that she had said that Grubb asked to review the documents.[89]

---

[85] *See id.* at A411 (Grubb's Testimony) (Q: "And did Miss Prater report on anything substantive to you that was taken from Mr. Robinson's cell?"  Grubb: "No.  I didn't ask her to.  The only thing I asked her was let me know if you see any of the materials that violate the protective order, and she told me no."); *id.* at A416–17 (Q: "And did you ever review or see any of the documents taken from Mr. Robinson's cell yourself?"  Grubb: "I went into the room that Ciritella put the documents, and I recall Ciritella holding up one document and saying, 'It's a bunch of this type of stuff, none of which is in violation of the protective order.'  But, I myself, never reviewed anything."  Q: "And were you provided, by either Special Investigator Ciritella or Miss Prater, with any information regarding Mr. Robinson's defense strategy?"  Grubb: "No."  Q: "Did either [Ciritella] or Miss Prater advise you of anything they saw regarding Mr. Robinson's defense strategy?"  Grubb: "No."  Q: "And besides Miss Prater, [Ciritella], and what you have just testified to about yourself, has anyone else reviewed any of the documents seized from Mr. Robinson's prison cell on the State's behalf?"  Grubb: "Not that I am aware of.").

[86] *See id.* at A518–19 (Ciritella's Testimony).

[87] *See id.*  Ciritella stated that he was not with Grubb during the alleged review, however.  *Id.* at A519 (Q: "Were you with him when he looked over the documents?"  Ciritella: "I was not, no.").

[88] Instead, Grubb's affidavit states that "[t]he documents were reviewed," and that he had access to them, but he did not specify who, other than Ciritella, did the reviewing—only that "[t]he trial prosecutors never saw any of the seized items, nor were they informed as to the content of any seized items."  *Id.* at A128 (Grubb's July 10, 2017 Affidavit).

[89] *See id.* at A557 (Q: "[D]id you tell Ciritella to get the documents back out again and put them in the Homicide conference room?"  Prater: "To get them out and put them back in the Homicide conference room?  No."  Q: "That never happened?"  Prater: "No."  Q: "Did you ever tell Ciritella that Joe Grubb wanted to look at the documents?"  Prater: "No."  Q: "Did Joe ever tell you he wanted to look at the documents?"  Prater: "No.").

Second, Prater testified that she reviewed Robinson's notes, which reflected information that he received from Woloshin. Although Prater testified that she did not share any information with Downs or Denney,[90] when asked whether she shared information about the documents with any other person, she identified Grubb. She did not, however, expressly state that Grubb was the *only* person she communicated with about the review.[91] Further, Prater testified that, while she did not remember the substance of anything she reviewed at the time of her testimony, she "remembered easily what [she] had reviewed" immediately following her review.[92] Notably, the record is unclear as to when Grubb may have instructed Prater to refrain from communicating with Downs and Denney—that is, whether it was before Downs removed her from the Murder case, or after her removal, which was nearly two weeks after her review of Robinson's documents.[93]

---

[90] *See id.* at A549–50 (Prater's Testimony) (Q: "During that discussion [with Downs about her removal from the Murder Case], did you have any reason, or did you inform Mr. Downs of anything that you found?" Prater: "I did not." Q: "Since that point in time, or at any time since the 30th of June of this year, have you had any discussions with Mr. Downs or Mr. Denney concerning the tasks that you were asked to perform with respect to documents taken from Mr. Robinson's cell?" Prater: "Absolutely not.").

[91] *Id.* at A537–38 (Prater's Testimony) (Q: "Did you share any of the information that you gleaned from that review of witnesses with anyone else in the Department of Justice?" Prater: "Joe Grubb." Q: "Did you share it with either John Downs or Mark Denney?" Prater: "No." Q: "How about Cliff Dempsey?" Prater: "No." Q: "And did you discuss any of your assessment with John Ciritella?" Prater: "I did not. I think I turned to him and said I didn't find anything. And that's what I told Mr. Grubb, as well."); *id.* at A539 (Q: "Were you reading and noting any of the substance of what was contained on that legal pad?" Prater: "I read through the legal pad. I was not noting or retaining the substance." Q: "Did you take any notes of that?" Prater: "No." Q: "Did you provide a summary to anyone at all following your review of that material?" Prater: "I provided a general summary to Joe, but not of the substance; just basically what I reviewed.").

[92] *Id.* at A534, A537 (Prater's Testimony).

[93] *See id.* at A416–17 (Grubb's Testimony) (Q: "And *after* you removed [Prater], did you provide any instructions to her about her communications with the trial prosecutor?" Grubb: "I did. She was not to communicate with them at all." (emphasis added)). In fact, during the gap between her

25

*C. The May 1, 2018 Decision*

After considering the relevant testimony, reviewing Robinson's documents *in camera*,[94] and considering additional briefing by the parties, the Superior Court issued its May 2018 Opinion dismissing Robinson's indictment with prejudice. The court held that the State's seizure of attorney-client material was improper and could not be legally justified for several reasons.

*First*, the State's Fourth Amendment justification was misplaced. The State had argued that the search and seizure was constitutionally valid because defendants do not have a reasonable expectation of privacy in prison cells.[95] But the court explained that the State failed "to appreciate the substantial differences between Fourth and Sixth

---

review of the documents and Grubb's instructions not to communicate with Downs or Denney, Prater emailed Downs at least twice with non-substantive updates on the return of Robinson's documents. *See* App. to Answering Br. at B94 (July 6, 2017 Email from Prater to Downs) ("Just so you know . . . On Saturday I mentioned to [Ciritella] and Grubb that we should return the documents, Grubb agreed and I thought it had been done."); *id.* at B101 (July 7, 2017 Email from Prater to Downs) ("FYI documents were returned/delivered to [Sussex Correctional Institute] this morning.").

[94] Although it is unclear when the court conducted its *in camera* review, the record indicates that it initially occurred between the October 25 and November 21 hearings. *See* App. to Opening Br. at A634–35 (Nov. 21, 2017 Hearing Transcript).

[95] *See id.* at A233 (State's Sur-Reply to Defendant's Motion to Dismiss) ("Robinson argues that the State acted improperly by requesting the Department of Corrections conduct a search of his prison cell and seize his protected legal communications with his attorneys without obtaining permission from the Court, applying for a search warrant, or establishing probable cause to conduct the search. This argument fails. Robinson has no Fourth Amendment privacy rights in his prison cell. Robinson is well aware of this fact, as this Court, in this case, had issued a ruling earlier this year to that effect." (citation omitted)); *see also id.* at A424–25 (Grubb's Testimony) (Q: "Why not just get a search warrant?" Grubb: "Didn't need to." Q: "Why?" Grubb: "Well, you know as well as I do, you legally do not need to. . . . [Y]ou legally do not need a search warrant to search an inmates cell.").

26

Amendment jurisprudence" applicable here.[96]  For example, the court noted that prisoners are afforded their right to assistance of counsel, which bars prison officials from listening to or reading attorney-client communications.  Nonetheless, a member of the prosecution team (Prater) reviewed privileged communications containing defense strategy.

*Second*, the State's reliance on the crime-fraud exception to the attorney-client privilege was improper because "application of the crime-fraud exception . . . requires judicial oversight and approval," which the State did not seek.[97]  But even if the State had sought judicial approval, the court stated that it would have denied the request:

> The Court's inquiry would have revealed that there was no basis to intrude on the attorney-client privilege because no witness names had been produced by the State, Defense Counsel had permission to share the "content" of witness statements with her client, and the record evidence would have demonstrated that Defense Counsel had steadfastly refused to provide information to her client that would have violated the TMG Protective Order.[98]

Additionally, the Superior Court held that the State should have applied for a search warrant, but that the warrant would not have issued regardless because the State did not have probable cause for the same reasons the court would not have granted judicial

---

[96] *May 2018 Opinion*, 2018 WL 2085066, at *6.

[97] *Id.* at *7.

[98] *Id.* at *8.  The phone calls that the State relied on as evidence to search Robinson's cell at least partially suggested that Woloshin had complied with the Protective Order and that neither she nor Robinson knew the identities of the witnesses.  For example, in response to a question from his mother during a phone call about whether Woloshin knew the witnesses, Robinson replied, "[y]eah she don't even know."  App. to Opening Br. at A65 (April 18, 2017 Phone Transcript).  In the same call, he indicated that he was making assumptions about witnesses: "while I'm making assumptions of who they are [Woloshin] was like, ah, you can't tell nobody who they are. . . .  So I can't tell you who the witnesses are."  *Id.* at A67.

approval. Further, the court rejected the State's contention that it had to conduct a search immediately to protect witness safety, as the State only sought evidence of a Protective Order violation, not actual witness intimidation, and it displayed no urgency in conducting the investigation.[99]

*Third*, and finally, the State failed to employ a taint team. Instead, "the State took no steps to screen the Prosecution Team to protect the integrity of the attorney-client privilege."[100] The prosecutors led the Protective Order investigation until less than two weeks before trial in the Murder Case, and even after that point, the court found that the State's claims that the prosecutors were screened from the case were not supported by the record. Additionally, Prater helped review the privileged documents and remained on the trial team for nearly another two weeks to assist with final trial preparations.

Thus, the court held that Robinson had suffered both presumed and actual prejudice because the State had deliberately interfered with Robinson's Sixth Amendment rights, "which could cause a chilling effect on [Robinson's] attorney-client communications in the future."[101] Additionally, the court held that Robinson suffered prejudice because: (i) Grubb selected a member of the prosecution team (Prater) to review Robinson's documents, which included letters from Woloshin and his handwritten notes reflecting communications from

---

[99] For example, although the State suspected the possible sharing of witness information with Robinson by May 10, 2017, "the State did not take any further action in this investigation until June 9, 2017 when it issued the first subpoena for Defendant's phone records. Two more weeks elapsed before the State issued the additional subpoenas." *May 2018 Opinion*, 2018 WL 2085066, at *9.

[100] *Id.* at *10.

[101] *Id.* at *13 (citation omitted).

Woloshin;[102] (ii) Prater remained on the prosecution team until the scheduled start of the trial;[103] (iii) Downs and Denney were not effectively screened from the Protective Order investigation, given that they "conducted interviews, issued subpoenas, listened to phone calls, and reviewed call logs" leading up to the search;[104] and (iv) the "the State's actions have caused a significant delay in [Robinson's] prosecution" during which time he "has been detained."[105]

With these facts in mind, the court turned to a remedy. The State argued that Robinson was not entitled to any remedy because trial had not yet taken place and, thus, any prejudice he suffered could be rectified before trial. But the State failed to propose any alternative remedies to dismissal throughout the entirety of the Superior Court proceedings.[106] Regardless, the court rejected State's argument, explaining that:

---

[102] *Id.* at *5 ("[Grubb] chose to place the documents in a large conference room for review by [Prater]. [Prater] reviewed the documents, which included letters from [Woloshin] to [Robinson] and [Robinson's] handwritten notes on a legal pad and loose pieces of paper. [Prater's] review was detailed enough to conclude that [Woloshin] discussed the substance of redacted police reports with [Robinson] and [Prater] reported her conclusions to [Grubb].").

[103] *Id.* at *10; *see also id.* at *11 ("The State did not . . . even remove [Prater] until July 14, 2017, after the trial had already been continued.").

[104] *Id.* at *10 ("[Downs and Denney] were not effectively screened from the State's Protective Order Investigation. For example, [Downs] directly met with [Grubb] and [Ciritella] before the search to tell [Ciritella] what to search for in the cell. In addition, [Downs and Denney] interviewed the Intermediate Inmate for the second time on June 30, 2017, the same day as the search, seizure, and review. Moreover, [Downs and Denney] were responsible for responding to the Court's initial inquiries about the search of [Robinson's] cell, and facilitated the return of [Robinson's] documents to him.").

[105] *Id.* at *16.

[106] *See, e.g.*, App. to Opening Br. at A251–53 (State's Sur-Reply to Defendant's Mot. to Dismiss Indictment) (arguing that Robinson was not entitled to dismissal, but not proposing any alternative remedy); Oral Argument Video at 18:50–19:09, https://livestream.com/DelawareSupremeCourt/events/8570210/videos/187665632 (Court: "If you don't prevail on the only argument you fairly presented below, why don't they win?" State:

29

> [T]he State's position would mean that it can intentionally review a defendant's privileged attorney-client communications at any time before trial without any consequences. Such a rule would vitiate the fundamental importance of a defendant's right to the assistance of counsel and give the State a license to violate the Sixth Amendment rights of defendants in the future.[107]

Despite the State's failure to propose a remedy, the court identified several potential alternatives to dismissal, including replacing the entire prosecution team, destroying all of the State's work product, releasing Robinson on pretrial supervision, and barring Grubb, Ciritella, and Marvel from working on any of Robinson's cases.

The court ultimately determined that alternative remedies were inadequate because "the prejudice to Defendant is much broader, and the affront to the rule of law is more profound, than can be addressed by these limited remedies."[108]  For example, the court noted that according to Ciritella's testimony, the State may have carried out similar searches in the past:

> Q: Have you ever done a search like this before?
>
> Ciritella: Yes, sir.
>
> Q: So let me be specific.  Have you done . . . a seizure and review of an inmate's legal paperwork?
>
> Ciritella: Yes.
>
> Q: Okay.  And I don't want you to say case names, or anything.  To your knowledge, were those pursuant to a search warrant, or anything like that?

---

"The State did present an argument that dismissal was not appropriate."  Court: "As a remedy?"  State: "As a remedy."  Court: "And you proposed what alternative remedy?"  State: "We proposed that there need not be a remedy.").

[107] *May 2018 Opinion*, 2018 WL 2085066, at *16.

[108] *Id.* at *17.

Ciritella: No, sir, they were not.

Q: So you have experience in going through client documents—pardon me, attorney-client documents to determine if a protective order has been violated?

Ciritella: If there is probable cause to believe that there is some type of violation, yes.
. . .

Q: Before the Jacquez Robinson review that you conducted, how many times would you say that you looked through documents from cells of inmates looking for things that may have violated a protective order?

Ciritella: I think maybe one other time.[109]

Further, the court held that the State did not fully accept responsibility for the shortcomings in its investigation or "demonstrate concern for Defendant's right to a fair trial," and it "demonstrated a seeming indifference to the serious constitutional issues at stake throughout these proceedings."[110] For example, the State failed to comply with the court's

---

[109] App. to Opening Br. at A500–02 (Ciritella's Testimony).

[110] *May 2018 Opinion*, 2018 WL 2085066, at \*13–\*14. The Superior Court also criticized the State's baseless accusations against Woloshin during the motion to dismiss proceedings:

> [D]espite having no evidence in support of its argument, the State has continued to suggest that Defense Counsel engaged in improper behavior. For example, in its most recent submission to this Court, the State wrote, "Apparently, to gain trust, [Woloshin] either violated the TMG Protective Order or duped her client into believing she was providing him more than was permitted." The Court finds that the State's *ad hominem* attacks against Defense Counsel are disrespectful and unprofessional, falling short of the Court's expectations for professionalism and civility for Delaware lawyers.

*Id.* at \*13 n.92 (citation omitted). We agree. At the outset, the State could have raised any concerns with Woloshin, which is what happened in *In re Koyste*, 111 A.3d 581 (Del. 2015). There, the defense lawyer admitted to violating a protective order and self-reported to the judge the same day. As officers of the Court and members of the Delaware Bar, this option merited more serious consideration by the State.

order to identify each person who reviewed Robinson's documents, conduct a comprehensive email search, and produce responsive emails.

Thus, while noting that dismissal was a "severe" and "unfortunate" result, the Superior Court held that it was the only adequate remedy "because any lesser sanction would unduly depreciate the seriousness of the State's actions and the extent to which the State's actions put at risk the most fundamental constitutional requirements."[111] Further, the court held that dismissal was the only remedy that would "deter the State from violating the Sixth Amendment rights of criminal defendants in the future."[112]

On May 2, 2018, the day after the Superior Court's decision, the State filed its notice of appeal.

### IV. Claims on Appeal

The State appeals the Superior Court's dismissal of Robinson's indictment on two grounds. *First*, the State claims that it did not violate Robinson's Sixth Amendment right to assistance of counsel because Robinson's ability to defend himself was not affected in any way by the State's warrantless search and seizure of his documents. Specifically, the State claims that its seizure of Robinson's documents did not prejudice him because it returned the documents, trial was continued, no records of the material were retained, and no privileged documents were conveyed to Downs or Denney. *Second*, even assuming that

---

[111] *May 2018 Opinion*, 2018 WL 2085066, at *17.

[112] *Id.*

32

its actions did prejudice Robinson, the State contends that dismissal was an inappropriate remedy in the absence of any demonstrable, irreparable prejudice to Robinson.

Robinson disputes both of the State's arguments. He contends that the Superior Court not only correctly presumed prejudice, but correctly found actual prejudice caused by the State's intentional intrusion into his attorney-client relationship, and by learning the details of his trial strategy only eleven days before the murder trial. Further, while acknowledging that dismissal is an extreme sanction, Robinson argues that it is warranted here because of the affront to the rule of law and as a means of curbing future misconduct by the State.

## V.    *Standard of Review*

The State's arguments concerning Robinson's alleged Sixth Amendment violation are issues of law that we review *de novo*.[113]  Further, we review *de novo* the Superior Court's application of the law to these facts,[114] along with the "embedded legal conclusions" in the court's remedy analysis.[115]  We will not disturb the Superior Court's factual findings if they are supported by competent evidence.[116]

---

[113] *See Cooke v. State*, 977 A.2d 803, 840 (Del. 2009).

[114] *See Lewis v. State*, 2018 WL 619706, at *1 (Del. Jan. 29, 2018) (TABLE) ("'Where it is alleged that the Superior Court erred in formulating and applying the law to undisputed facts, we exercise *de novo* review.'" (quoting *Pendleton v. State*, 990 A.2d 417, 419 (Del. 2010))).

[115] *North River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 380–81 (Del. 2014).

[116] *See Gattis v. State*, 955 A.2d 1276, 1287 (Del. 2008).

## VI. Analysis

### A. The State Violated Robinson's Sixth Amendment Rights

Any discussion addressing governmental interference with a defendant's Sixth Amendment right to counsel must acknowledge the centrality of the attorney-client privilege, which is fundamental to the exercise of that right. The privilege was designed to encourage full disclosure by a client to his or her attorney in order to facilitate the rendering of legal advice.[117] For the adversary system to function properly, any such advice must be shielded from exposure to the government.[118] That did not happen here. In fact, the State deliberately invaded Robinson's attorney-client privilege by searching for, seizing, and reviewing his legal materials.

In this case, the parties have debated intensely about what is required to establish a violation of the Sixth Amendment.[119] That debate is understandable given that the federal

---

[117] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (noting that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice"); *Levy*, 577 F.2d at 209 ("The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful."). The United States Supreme Court has also noted that "conferences between counsel and accused . . . sometimes partake of the inviolable character of the confessional." *Powell v. Alabama*, 287 U.S. 45, 61 (1932).

[118] *See Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993) (stating that the essential purpose of the sixth amendment right to counsel is to protect the fundamental right to a fair trial); *United States v. Cronic*, 466 U.S. 648, 658 (1984) ("[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.").

[119] Robinson has not advanced an argument on appeal that the State has violated the Delaware Constitution.

courts are divided on important aspects of the analysis, including whether a showing of prejudice to the defendant is required to establish a violation when the government intentionally invades a defendant's privileged communications.  Courts have also differed as to who bears the burden of proof and the standard of proof in analyzing prejudice in the remedy analysis.[120]

In *Weatherford*, the United States Supreme Court held that a threat of significant harm to the defendant was a critical element of a non-deliberate violation of the Sixth Amendment.  There, attendance by an undercover agent at a meeting with the criminal defendant and his attorney did not constitute a Sixth Amendment violation.  The Court, rejecting the Fourth Circuit's *per se* rule, reasoned that "[a]t no time did [the agent] discuss with or pass on to his superiors or to the prosecuting attorney or any of the attorney's staff 'any details or information regarding the plaintiff's trial plans, strategy, or anything having to do with the criminal action pending against plaintiff.'"[121]

---

[120] *See Cutillo v. Cinelli*, 485 U.S. 1037, 1037 (1988) (White, J., joined by Rehnquist, C.J. and O'Connor, J., dissenting from denial of petition for writ of certiorari) (noting a three-way circuit split on the "issue of who bears the burden of persuasion for establishing prejudice or lack thereof when the Sixth Amendment violation involves the transmission of confidential defense strategy information"); *People v. Alexander*, 235 P.3d 873, 913 n.23 (Cal. 2010) ("We are aware of no decision by the high court in the intervening years that has answered the questions left unresolved in *Weatherford*—what showing of injury to the defendant or benefit to the State is, *in the affirmative*, required to prove a Sixth Amendment violation, and who bears the burden of persuasion." (citing *Cutillo*, 485 U.S. at 1037)), *cert. denied*, 563 U.S. 945 (2011).

[121] *Weatherford*, 429 U.S. at 548.  The Fourth Circuit's *per se* rule provided that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." *Bursey v. Weatherford*, 528 F.2d 483, 486 (4th Cir. 1975).

But the Supreme Court suggested four factors that could strongly indicate a Sixth Amendment violation, namely:

> [1] Had [the agent] testified at [the defendant's] trial as to the conversation between [the defendant] and [his attorney]; [2] had any of the State's evidence originated in these conversations; [3] had those overheard conversations been used in any other way to the substantial detriment of [the defendant]; or even [4] had the prosecution learned from [the agent] the details of the [attorney-client] conversations about trial preparations, [the defendant] would have had a much stronger case.[122]

In *Weatherford*, the government did not violate the defendant's Sixth Amendment right to counsel because "[n]one of these elements [were] present."[123] It stated further that "[u]nless [the agent] communicated the substance of the [attorney-client] conversations and thereby created *at least a realistic possibility of injury [to defendant], or benefit to the State, there can be no Sixth Amendment violation*."[124] Thus, in *Weatherford*, where there was a significant investigative justification, the Supreme Court did not consider whether an intentional invasion of the privilege by the government might constitute a *per se* violation of the Sixth Amendment.[125] But the Court appeared to recognize that the prejudice requirement it articulated does not necessarily govern intentional intrusions by the prosecution that lack a legitimate purpose.

---

[122] *Weatherford*, 429 U.S. at 554 (footnote omitted).

[123] *Id.* at 555.

[124] *Id.* at 558 (emphasis added).

[125] *See* 3 Wayne R. LaFave et. al., *Criminal Procedure* § 11.8 (b) (4th ed. 2018) ("*Weatherford* also does not answer the question of whether a *per se* Sixth Amendment violation can be established, where the prosecutorial intrusion into the lawyer-client relationship clearly lacks any legitimate justification.").

Three years later, in *Morrison*, the Supreme Court did consider the appropriate remedy for the government's deliberate intrusion into the attorney-client relationship when the intrusion did not prejudice the defendant's representation. There, federal drug agents met with the defendant twice without her attorney's knowledge, although they were aware that she had retained counsel.[126] The agents sought her cooperation, disparaged her attorney, and threatened her with more severe penalties if she refused to cooperate.[127] However, she did not cooperate or provide them with any incriminating information about herself or her case. She also maintained her relationship with her counsel.[128]

The United States Court of Appeals for the Third Circuit held that this conduct violated the defendant's right to counsel, even if the government's conduct had not adversely impacted her representation. It dismissed the indictment with prejudice.[129]

The Supreme Court unanimously reversed. In doing so, it did not address the government's contention that no Sixth Amendment violation occurs unless its conduct prejudices the defendant. Rather, the Court *assumed* that the government had violated the Sixth Amendment, but held that the Third Circuit had erred in dismissing the indictment.[130] It stated that "absent demonstrable prejudice, or substantial threat thereof,

---

[126] *Morrison*, 449 U.S. at 362–63.

[127] *Id.* at 362.

[128] *Id.* at 362–63.

[129] *Id.* at 363.

[130] *Id.* at 364 ("The United States initially urges that absent some showing of prejudice, there could be no Sixth Amendment violation to be remedied. Because we agree with the United States, however, that the dismissal of the indictment was error in any event, we shall assume, without deciding, that the Sixth Amendment was violated in the circumstances of this case.").

dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate."[131]

The Supreme Court held that remedies for the Sixth Amendment violations should be tailored to the injury suffered. It stated that the "premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense," and that "[a]bsent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding."[132] Because the defendant had not established any "transitory or permanent" prejudice,[133] the government's violation did not justify interfering in the proceedings. Thus, *Morrison* makes clear that dismissal of an indictment is a drastic remedy for a Sixth Amendment violation absent a showing of actual prejudice or a substantial threat of prejudice to the defendant's representation.

Following *Weatherford* and *Morrison* (both decisions authored by Justice White), some courts and commentators have suggested that because the Supreme Court did not address the government's argument that a showing of prejudice was needed to establish a Sixth Amendment violation, "*Morrison* 'left open the possibility that the Court might adopt a per se standard for those state invasions of the lawyer-client relationship that are not supported by any legitimate state motivation.'"[134] This might be the case, for example,

---

[131] *Id.* at 365 (footnote omitted).

[132] *Id.*

[133] *Id.* at 366.

[134] *State v. Bain*, 872 N.W.2d 777, 786 (Neb. 2016) (quoting 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.8(b) at 848–49 (3d ed. 2007)); *see also United States v. Morales*, 635 F.2d 177,

where the prosecution acts intentionally and without legitimate purpose.[135] The federal appellate courts are divided on this issue.

The United States Courts of Appeals for the Third and Tenth Circuits have held that intentional intrusions by the prosecution into the defendant's attorney-client privileged information, at least without a legitimate purpose, constitute a *per se* violation of the Sixth Amendment with no need to demonstrate that the defendant has suffered prejudice as a

---

179 (2d Cir. 1980) ("[B]ecause the in camera evidence, now unsealed, does not disclose an intentional, governmentally instigated intrusion upon confidential discussion between appellants and their attorneys, the evidence does not support appellants' claim of a per se violation of their right to counsel." (citations omitted)).

[135] *See, e.g.*, *Briggs v. Goodwin*, 698, F.2d 486, 493 n.22 (D.C. Cir. 1983) (noting that "[a] deliberate attempt by the government to obtain defense strategy information or to otherwise interfere with the attorney-defendant relationship through the use of an undercover agent may constitute a *per se* violation of the Sixth Amendment" (citations omitted)), *reh'g granted, opinion vacated, and on reh'g*, 712 F.2d 1444 (D.C. Cir. 1983).

result of the disclosure.[136] The Sixth,[137] Eighth,[138] and Ninth[139] Circuits have held that even where the government intentionally intrudes in the attorney-client relationship, the defendant must demonstrate prejudice to establish a Sixth Amendment violation warranting a remedy. The First Circuit has adopted a "middle position" in which it requires the government to prove the absence of prejudice upon the defendant's *prima facie* showing of prejudice.[140] As the First Circuit has observed, "[t]he burden on the

---

[136] *See Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995) (holding that an intentional intrusion into the attorney-client relationship "must constitute a *per se* violation of the Sixth Amendment," and that if the government "lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed"); *Levy*, 577 F.2d at 209 (holding that "the inquiry into prejudice must stop" where defense strategy material is actually disclosed to the prosecution or the government intentionally sought such confidential information). At least one state has followed this approach. *See, e.g.*, *State v. Quattlebaum*, 527 S.E.2d 105, 109 (S.C. 2000) (reversing conviction for new trial and holding that "a defendant must show either deliberate prosecutorial misconduct *or* prejudice to make out a violation of the Sixth Amendment, but not both," and that "[d]eliberate prosecutorial misconduct raises an irrebuttable presumption of prejudice").

[137] *See United States v. Collins*, 1991 WL 23558, at *13 (6th Cir. Feb. 26, 1991) (TABLE) ("'Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted.'" (quoting *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984))).

[138] *See United States v. Johnson*, 47 F.3d 272, 275 (8th Cir. 1995) (holding that dismissal was improper because, even assuming the government intentionally violated the defendant's Sixth Amendment rights, he had failed to "demonstrate a nexus between this intrusion and any benefit derived by the prosecution" (citing *United States v. Davis*, 646 F.2d 1298, 1303 (8th Cir. 1981))); *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) ("To establish a sixth amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice." (citations omitted)).

[139] *See United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003) ("[I]n this circuit we fold the prejudice analysis into the analysis of the Sixth Amendment right itself when the prosecution has improperly interfered with the attorney-client relationship and thereby obtained information about trial strategy. We have construed *Weatherford* to mean that there "is no Sixth Amendment violation unless there is prejudice.").

[140] *United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir. 1984) (noting that "[l]ike the District of Columbia and Third Circuits, we believe that placing the entire burden on the defendant to prove both disclosure and use of confidential information is unreasonable," but "[l]ike the Ninth Circuit,

40

government is high because to require anything less would be to condone intrusions into a defendant's protected attorney-client communications."[141]

As for the courts that presume prejudice to the defendant, some have held that the government's possession of a defendant's privileged information is a *per se* Sixth Amendment violation requiring dismissal of the conviction. Others have held that the presumption of prejudice is rebuttable. As for this latter category, the Connecticut Supreme Court, for example, has held that the presumption of prejudice resulting from an invasion of a defendant's privileged communications, whether intentional or not, can be rebutted by the State. The State must show by clear and convincing evidence that no person with knowledge of the communications was involved in the investigation or prosecution, that the communications contained minimal privileged information, or that it has access to all of the information from other sources.[142] The Nebraska Supreme Court adopted the same

---

however, we believe that there are certain circumstances in which the revelation of confidential communications by the informant is harmless"); *see also United States v. DeCologero*, 530 F.3d 36, 64 (1st Cir. 2008) ("'[T]he government's intrusion into the attorney-client relationship' is not a *per se* Sixth Amendment violation; there must also be some demonstration of resulting prejudice. Because such intrusions pose a serious risk to defendants' constitutional rights, and because it would be unreasonably difficult for most defendants to prove prejudice, we only require defendants to make a prima facie showing of prejudice by 'prov[ing] that confidential communications were conveyed as a result' of the government intrusion into the attorney-client relationship. The burden then shifts to the government to show that the defendant was not prejudiced; that burden is a demanding one." (quoting *Mastroianni*, 749 F.2d at 907–08)).

[141] *Mastroianni*, 749 F.2d at 908. Courts employing this approach reason that it is virtually impossible for a defendant to demonstrate prejudice because a defendant can only guess at whether and how the information has been used.

[142] *See State v. Lenarz*, 22 A.3d 536, 542 (Conn. 2011). Other states have adopted different standards of proof to rebut a presumption of prejudice or taint. *See State v. Robins*, 431 P.3d 260, 271–72 (Idaho 2018) (holding that a presumption of prejudice exists where the prosecutor gained access to privileged information, and that the presumption was rebuttable by a preponderance of the evidence showing that her arguments during trial had a source independent from the privileged material); *State v. Taylor*, 49 N.E.3d 1019, 1027 (Ind. 2016) (holding that an irrebuttable

standard in *State v. Bain*,[143] holding that a presumption of prejudice exists when the government becomes privy to a defendant's trial strategy, and that the presumption can be rebutted by clear and convincing evidence—"at least when the State did not deliberately intrude into the attorney client relationship."[144]

As for the former category, in *Levy* (decided after *Weatherford* but before *Morrison*), for example, the Third Circuit viewed *Weatherford* as "suggesting by negative inference that a sixth amendment violation would be found where, as here, defense strategy was actually disclosed or where, as here, the government enforcement officials sought such confidential information."[145] In other words, "when *actual disclosure* occurred," the court found no need to inquire into prejudice.[146]

The Third Circuit viewed speculation about possible prejudice to the defense resulting from actual disclosure of confidential communications to the government as

---

presumption of prejudice "crosses the line from rightly shielding [defendant] from *actual* prejudice to granting him a windfall against a potentially still-viable murder prosecution," and that "a presumption of taint, rebuttable only beyond a reasonable doubt, strikes a better balance"); *State v. Fuentes*, 318 P.3d 257, 262 (Wash. 2014) ("[W]e hold that the presumption of prejudice arising from such eavesdropping is rebuttable. . . . The proper standard the trial court must apply is proof beyond a reasonable doubt with the burden on the State.").

[143] 872 N.W.2d 777 (Neb. 2016).

[144] *Id*. at 791. In *Bain*, a prosecutor reported that while going through discovery materials, he came across documents containing confidential communications of defendant's original trial counsel that revealed the defense's strategy at that time. *Id*. at 781.

[145] *Levy*, 577 F.2d at 210. In *Levy*, the defendant was represented by an attorney who was also representing a co-defendant. *Id*. at 202–03. Unknown to the defendant or the attorney, that co-defendant was an informer to the DEA, who attempted to gain information from the informant about the defendant's trial preparation. *Id*.

[146] *Id*. (emphasis added).

dangerous if the court were to adopt a test weighing the prejudice on a case-by-case

basis.[147]  It reasoned:

> [I]t is highly unlikely that a court can, in [a pretrial] hearing, arrive at a
> certain conclusion as to *how* the government's knowledge of any part of the
> defense strategy *might benefit* the government in its further investigation of
> the case, in the subtle process of pretrial discussion with potential witnesses,
> in the selection of jurors, or in the dynamics of trial itself.
> . . . .
>
> [T]he interests at stake in the attorney-client relationship are unlike the
> expectations of privacy that underlie the fourth amendment exclusionary
> rule.  The fundamental justification for the sixth amendment right to counsel
> is the presumed inability of a defendant to make informed choices about the
> preparation and conduct of his defense.  Free two-way communication
> between client and attorney is essential if the professional assistance
> guaranteed by the sixth amendment is to be meaningful.  The purpose of the
> attorney-client privilege is inextricably linked to the very integrity and
> accuracy of the fact finding process itself. . . .  In order for the adversary
> system to function properly, *any advice received as a result of a defendant's
> disclosure to counsel must be insulated from the government*. . . .  We think
> that the *inquiry into prejudice must stop at the point where attorney-client
> confidences are actually disclosed to the government* enforcement agencies
> responsible for investigating and prosecuting the case.  Any other rule would
> disturb the balance implicit in the adversary system and thus would
> jeopardize the very process by which guilt and innocence are determined in
> our society.[148]

The Third Circuit concluded that the prosecutor's knowledge of the defendant's trial

strategy required a *per se* reversal of a subsequent conviction, since the prosecution's

strategic responses to this defense strategy were now in the public domain and known to

any subsequent prosecution.  Thus, it concluded that dismissal of the indictment was the

---

[147] *Id*. at 208 ("The dangers of speculating about possible prejudice are demonstrated most forcefully by the facts of the instant case.").

[148] *Id*. at 208–09 (emphasis added).

43

only appropriate remedy.[149]  The court expressly declined to decide whether dismissal would be required when defense strategy has been disclosed to government agents but has not become public information.[150]  As the trial court aptly observed in this case, "[t]here has been some confusion over whether *Levy* is still good law" following *Morrison*.[151]  The following discussion of Third Circuit cases makes the point.

Six years after *Levy*, the Third Circuit, in *United States v. Costanzo*,[152] applied *Weatherford* in deciding another case involving an alleged Sixth Amendment violation.[153] Citing the "three branches of the *Weatherford* test," the court stated that the government violates a person's Sixth Amendment rights when it:

> (1) Intentionally plants an informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant.[154]

Although none of those circumstances was present in *Costanzo*, the Third Circuit implied that *Levy* was still viable after *Morrison*, concluding that "the *Levy* rule does not apply to

---

[149] *Id.* at 210.

[150] *Id.*

[151] *September 2017 Opinion*, 2017 WL 4675760, at *4.

[152] 740 F.2d 251 (3d Cir. 1984).

[153] *Id.* at 254–57 (applying the *Weatherford* test but finding that the facts of the trial court's findings did not implicate *Levy* because the government "did not intentionally invade confidential attorney-client conversations").

[154] *Id*. at 254 (citing *Weatherford*, 429 U.S. at 554).

petitioner's case," given the findings of the district court that no defense strategy had been disclosed.[155]

But in 1996, in *United States v. Voigt*,[156] the Third Circuit questioned whether *Levy* was still good law, and observed in a footnote that "to the extent that *Levy* can be read as holding that certain government conduct is *per se* prejudicial, we note that the Supreme Court has since [in *Morrison*] held to the contrary."[157]

The Third Circuit further explained its holding in *Levy* in its 2012 opinion, *United States v. Mitan*.[158]  In its analysis, the Third Circuit stated that "*Levy* crafted a three part test examining: (1) intentional government conduct, (2) attorney-client privilege, and (3) the release of confidential legal strategy.  When those circumstances coalesce, *Levy* dispenses with an inquiry into whether the defense was prejudiced."[159]  But, in *Mitan*, the Third Circuit declined to address the question of whether *Morrison* precludes *Levy's* presumption of prejudice approach because it found that the defendant could not show the factual predicate for the presumption, namely, an intentional invasion by the government into any attorney-client relationship.  The Third Circuit assumed that *Levy's* approach remained viable, but it observed, again in a footnote, that "[its] interpretation of *Weatherford* in *Levy*, however, was called into question just two years later when the

---

[155] *Id*. at 257.

[156] 89 F.3d 1050 (3d Cir. 1996).

[157] *Id*. at 1070–71 n.9 (citing *Morrison*, 449 U.S. at 365–66); *see also United States v. Boffa*, 89 F.R.D. 523, 533 (D. Del. 1981) (stating that *Morrison* "effectively repudiated" *Levy's per se* rule).

[158] 499 Fed. App'x 187 (3d Cir. 2012).

[159] *Id*. at 192.

[United States Supreme Court] declared in *United States v. Morrison* that 'absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the [Sixth Amendment] violation may have been deliberate.'"[160]

Understandably, the parties here vigorously dispute whether prejudice still may be presumed under *Levy*. But that is a question we need not definitively resolve today because the Superior Court did not merely presume prejudice.[161] Instead, it concluded that the Defendant had "suffered substantial prejudice as a result of the State's conduct."[162]

Specifically, the trial court found that the State selected Prater to review the seized documents containing Defendant's privileged attorney-client communications in detail, including letters from Woloshin and handwritten notes reflecting Woloshin's communications, from which Prater learned details of the defense trial strategy.[163] Prater was then allowed to "remain on the Prosecution Team and work with the Trial Prosecutors" on the State's final trial preparations, and the court found that the State did not implement any process to effectively screen the Trial Prosecutors from the investigation.[164] Further, Downs and Denney continued their involvement in the investigation until the eve of the

---

[160] *Id*. at 192 n.6 (quoting *Morrison*, 449 U.S. at 365).

[161] As discussed above, the trial court concluded that, under *Weatherford*, a defendant must show prejudice to establish a Sixth Amendment violation. However, it assumed *Levy's* continued viability and concluded that prejudice may be presumed if defense strategy was actually disclosed to the prosecution team. It also held that a deliberate interference with the attorney-client relationship can constitute a Sixth Amendment violation even without a showing of prejudice.

[162] *May 2018 Opinion*, 2018 WL 2085066, at *14 (citing *Morrison*, 449 U.S. at 365).

[163] *Id*. at *5, *10.

[164] *Id*. at *16.

46

search of Robinson's cell, including conducting interviews, issuing subpoenas, listening to phone calls, reviewing call logs, and speaking with Ciritella about what to search for in Robinson's cell. The trial court also observed that the State's actions caused "a significant delay in Defendant's prosecution" while Defendant remained in detention.[165]

In addition to these findings of prejudice, the trial court found that the State demonstrated "a seeming indifference to the serious constitutional issues at stake throughout these proceedings," pointing to the fact that "[Grubb], who authorized the search, seizure, and review," also appeared as "counsel for the State's response to the motion to dismiss until specifically instructed by the [c]ourt to involve [other] counsel who would not be called to testify as a witness."[166] The trial court also considered the State's various discovery failures, and the fact that the State's reasons for the intrusion, namely, its stated concerns about witness safety, were not supported by the record. Moreover, the trial court was seriously concerned that the "State's persistent refusal to accept responsibility for improper conduct in this matter" without a "significant sanction" would likely allow the State to "engage in additional abuses in the future."[167] This concern was warranted, in the trial court's view, because "[Ciritella] testified that he ha[d] previously conducted similar searches targeting a defendant's legal documents in other cases,

---

[165] *Id.*

[166] *Id.* at *14.

[167] *Id.*

suggesting that the State may have engaged in other unauthorized reviews of attorney-client communications."[168]

In sum, because the trial court made findings of actual prejudice, and because the State has not shown that those findings of actual prejudice are clearly erroneous, we need not broadly decide whether prejudice should be presumed in any case where the government obtains defendant's privileged materials.[169] Rather, we limit our holding to the facts here, where the State has deliberately invaded a defendant's attorney-client privilege and has obtained defendant's trial strategy information, and the defendant has suffered prejudice as a result. Based upon this aspect of the record, we affirm the Superior Court's holding that the State violated Robinson's Sixth Amendment rights and that he suffered actual prejudice. Accordingly, we affirm that aspect of the September 2017 Opinion.

---

[168] *Id*. The State interpreted Ciritella's testimony to mean that he had merely conducted standard cell-raids in the past, rather than searches targeting privileged material. *See* Oral Argument Video at 14:22–15:08, https://livestream.com/DelawareSupremeCourt/events/8570210/videos/187665632.

[169] In its Opening Brief on appeal, the State argued that the several of the trial court's factual findings are not supported by the record. Specifically, it challenges the court's findings that (1) the State took no steps to screen the prosecution team, (2) Prater learned the details of Robinson's defense strategy, or (3) the State purposefully intruded upon Robinson's confidential communications to gain access to defense strategy or to hamper Robinson's ability to prepare for trial. *See* Opening Br. at 38, 43. Regarding the first two challenges, the Superior Court's findings are not clearly erroneous. As to the third contention, the trial court did not find that the State intentionally attempted to gain an advantage by invading Robinson's attorney-client information. Rather, it found only that the State had intentionally searched for and reviewed his privileged material. Any other challenges to the trial court's factual findings have been waived. *See Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993) ("The failure to raise a legal issue in the text of the opening brief generally constitutes a waiver of that claim on appeal." (citations omitted)).

*B.*     *Tailoring the Remedy to the Injury Suffered*

This leads us to the next question: was dismissal of the indictment with prejudice sufficiently "tailored" to the prejudice Robinson suffered as *Morrison* requires? In *Morrison*, the Supreme Court offered general guidance on remedies in this context. The Court first recognized that upholding the Sixth Amendment right to counsel is often in tension with respecting society's interest in the administration of criminal justice:

> Our cases have accordingly been responsive to proved claims that governmental conduct has rendered counsel's assistance to the defendant ineffective. At the same time and without detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered for the constitutional violation and should not unnecessarily infringe on competing interests. Our relevant cases reflect this approach. . . . None of these deprivations, however, resulted in the dismissal of the indictment.
>
> . . . .
>
> *[W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or order a new trial if the evidence has been wrongfully admitted and the defendant convicted.*[170]

---

[170] *Morrison*, 449 U.S. at 364–65 (emphasis added) (citations omitted); *see also id.* at 364 ("This right [to have the assistance of counsel], fundamental to our system of justice is meant to assure fairness in the adversary criminal process." (citations omitted)); *Robins*, 431 P.3d at 269–70 ("[T]he prosecution's intrusion into the privileged strategic communications between a client and his attorney weakens the essential and demanding protections inherent in the constitutional right to counsel and undermines the balance necessary in our society's adversarial system of justice."); *Bailey v. State*, 521 A.2d 1069, 1083 (Del. 1987) ("The right of an accused person to have the assistance of counsel for his defense is fundamental to our system of justice and is meant to assure fairness in the adversary criminal process." (citing *Gideon v. Wainright*, 372 U.S. 335, 342–44 (1963))).

Accordingly, identification of a Sixth Amendment violation does not, alone, suggest that dismissal of the indictment is appropriate. Rather, the remedy for that violation must be "tailored to the injury suffered."[171] In tailoring the remedy, "[t]he interests supporting the sixth amendment right, meant to assure fairness in the adversary criminal process, must be reconciled with society's competing interest in prosecuting criminal conduct."[172] Thus, the Supreme Court emphasized in *Morrison* that its preferred approach "has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."[173] It explained that the premise of its prior cases "is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense."[174] "Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and a fair trial."[175]

Dismissal with prejudice—an extreme remedy—is the only remedy Robinson sought. In *Morrison*, the Supreme Court held that dismissal is a "drastic" form of relief,

---

[171] *Morrison*, 449 U.S. at 364; *see also United States v. Walker*, 839 F.2d 1483, 1487 (11th Cir. 1988) ("[E]ven if we were to deem this a constructive denial of counsel–and we refrain from so deciding–we cannot ignore the mandate of *Morrison* that the relief must be tailored to the wrong."); LaFave et al., *supra* note 125 ("Of course, under *Morrison*, even should the unjustified invasion be deemed a per se Sixth Amendment violation, the issue of prejudice becomes relevant in the assessment of the appropriate remedy, which must be 'tailored to the injury suffered.'").

[172] *Singer*, 785 F.2d at 234 (citing *Wainright*, 372 U.S. at 344).

[173] *Morrison*, 449 U.S. at 365.

[174] *Id.*

[175] *Id.*

50

and that "absent demonstrable prejudice, or substantial threat thereof, *dismissal of the indictment is plainly inappropriate*, even though the violation may have been deliberate."[176] Rather, "[t]he remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression."[177] Thus, the Court held that dismissal was inappropriate.

In *Shillinger v. Haworth*,[178] the Tenth Circuit observed that "dismissal of the indictment could, in extreme circumstances, be appropriate."[179] Other courts have observed that dismissal of a criminal case is a draconian remedy "of last resort."[180] The

---

[176] *Id*. at 365, 367 (emphasis added).

[177] *Id*. at 366–67. *See also United States v. Blue*, 384 U.S. 251, 255 (1966) ("Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. . . . Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." (citations omitted)). We also have recognized that the suppression of evidence may leave the government with no case to prosecute. *See Rogers v. Morgan*, 2019 WL 1446838, at *8 (Del. Apr. 2, 2019) ("Had the Superior Court granted the motion to suppress—thereby eliminating the evidence of events that occurred in the home—the State would have no evidence to support its case for resisting arrest." (citation omitted)).

[178] 70 F.3d 1132 (10th Cir. 1995).

[179] *Id*. at 1143 (citations omitted). The Tenth Circuit pointed to *United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994) as an example of an extreme circumstance where an indictment was dismissed because the government destroyed potentially exculpatory evidence.

[180] *United States v. Stein*, 541 F.3d 130, 144 (2d Cir. 2008) (citing *Morrison*, 449 U.S. at 365); *see also United States v. Orozco*, 916 F.3d 919, 925 (10th Cir. 2019) (holding that the district court abused its discretion in dismissing an indictment with prejudice based on a Sixth Amendment violation rather than ordering a new trial, noting that dismissal is an extraordinary remedy "only used in cases of serious and flagrant prosecutorial misconduct," and holding that dismissal was inappropriate because "less drastic remedies were available to address the district court's concerns"); *Virgin Islands v. Fahie*, 419 F.3d 249, 254 (3d Cir. 2005) (affirming Appellate Division's reversal of trial court's dismissal of an indictment, and stating, "in all jurisdictions, dismissal with prejudice is in practice a rare sanction for any constitutional violation," and noting

cases uniformly suggest that dismissal of the indictment is appropriate only where the injury is irreparable.[181]  For example, courts have held that dismissal is the appropriate remedy where the information has been disclosed to the public domain following trial,[182]

that its "research discloses no case where a federal appellate court upheld dismissal with prejudice as a remedy for a *Brady* violation" (citation omitted)); *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) ("Dismissal of an indictment with prejudice is the most severe sanction possible."); *United States v. Solomon*, 679 F.2d 1246, 1248–51 (8th Cir. 1982) (holding that the "drastic remedy" of dismissal was inappropriate even though the government's conduct was "highly improper" and "reprehensible"); *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) ("[T]he sanction [of dismissal] is so drastic that, especially where serious criminal misconduct is involved, it must be reserved for the truly extreme cases").

[181] *See United States v. Syed*, 1995 WL 216874, at *1 (7th Cir. Apr. 11, 1995) (TABLE) (interpreting *Morrison* to mean that "indictments must not be dismissed unless the government's conduct following the commission of the crime not only is unlawful but also causes *irreparable* prejudice to the defense of the charge" (emphasis added)); *Bohl*, 25 F.3d at 914 (dismissing the indictment because of the government's destruction of potentially exculpatory evidence and violation of defendant's due process rights); *Robins*, 431 P.3d at 272 ("[D]ismissing the charges should remain an option if the circumstances are such that prejudice arising from the State's prior transgression cannot be completely purged or escaped."); *Bailey*, 521 A.2d at 1086 ("In the absence of demonstrable *irreparable* prejudice, dismissal of an indictment is inappropriate, even though there has been interference with the right to be assisted by counsel." (emphasis added) (citations omitted)); *State v. Pecard*, 998 P.2d 453, 462–63 (Ariz. Ct. App. 1999) (holding that trial court abused its discretion in dismissing indictments as a result of Sixth Amendment violations since it should have considered lesser remedies assuring defendant a fair trial); LaFave et al., *supra* note 125 ("Apparently, only prejudice that is indelible and holds open the possibility of an unjust conviction would justify the dismissal with prejudice sought in *Morrison*." (citations omitted)).

[182] *See Levy*, 577 F.2d at 210 (suggesting that the prejudice to the defendant was irreparable because the disclosed information was in the public domain); *Lenarz*, 22 A.3d at 539, 558 (holding that because the prosecutor had reviewed a "detailed, explicit road map of the defendant's trial strategy," and had tried the case to conclusion, "the case is irreversibly tainted" and "the only available appropriate remedy is dismissal of the charge of which he was convicted").

where the government has effectively diminished the ability of the defendant to mount a full defense,[183] or where the government's misconduct secured the indictment.[184]

In contrast to Robinson's demand for dismissal, the State steadfastly adhered to its position that no Sixth Amendment violation occurred and that dismissal of the indictment was not warranted. It never proposed an alternative remedy. Thus, the trial court was faced with diametrically opposite "all or nothing" proposals on the remedy spectrum. But even so, the trial court appropriately considered several alternative remedies *sua sponte*, including replacing the entire prosecution team, destroying all of the State's work product, releasing Robinson on pretrial supervision, and barring Grubb, Ciritella, or Marvel from working on any of Robinson's cases.[185] The court concluded, however, that those remedies were inadequate. We explain next why this conclusion was error.

---

[183] *See Stein*, 541 F.3d at 144–46 (holding that harm was irreparable, and therefore dismissal was required, where the government hampered the defendants' ability to defend against the indictment by threatening their employer, who had planned to advance legal expenses without any conditions, unless the employer agreed to limit its advancement to the defendants).

[184] *United States v. Marshank*, 777 F. Supp. 1507, 1524–28 (N.D. Cal. 1991) (dismissing indictment where government schemed with defendant's attorney to secure the indictment and the defendant's cooperation).

[185] Other courts have held that it is incumbent on the court, *sua sponte*, to devise an adequate remedy to cure any prejudice to the defendant, even in the absence of any request by the parties. *See, e.g.*, *Bain*, 872 N.W.2d at 793 ("[W]hen a court is presented with evidence that the State has become privy to a defendant's confidential trial strategy, it must sua sponte conduct an evidentiary hearing that requires the State to prove that the disclosure did not prejudice the defendant, and it must also give the defendant an opportunity to challenge the State's proof."). Given that Robinson's Sixth Amendment rights must be balanced against the competing interest in the administration of justice, and even if faced with an "all or nothing" proposal from the parties, the trial court should, *sua sponte*, and as required by *Morrison*, consider what remedies might be appropriately tailored to the harm.

### 1.     *The Record on "Taint" Does Not Support Dismissal*

The overwhelming weight of the case law, including *Morrison*, which is binding on this Court, holds that dismissal of an indictment with prejudice (the most severe remedy) should not be imposed absent findings of irreparable prejudice. The overwhelming weight of the evidence here suggests that any "taint" was contained and did not infect the prosecutors. Downs and Denney both testified that they were unaware of the status of the investigation or of the contents of Robinson's documents. Further, of the four individuals who had access to the documents, Prater, Ciritella, and Marvel testified that they did not share information about the review with Downs or Denney. Grubb, the only other individual with access to the documents, testified that he did not review the documents himself and that he attempted to screen Downs and Denney from the Protective Order investigation. The case had not yet gone to trial and no evidence suggests that any privileged information found its way into the public domain.

We acknowledge that the record is not airtight. We do not have a high level of confidence in the completeness of the State's email production, for example. In addition, the questioning of Grubb and Prater could have more thoroughly explored the issue of taint. And it is unclear whether Grubb actually reviewed the documents, given the conflicting testimony on that point.[186] But based upon the record developed after two evidentiary hearings, we conclude that the record does not remotely come close to establishing irreparable taint or prejudice.

---

[186] *See supra* notes 86–89 and accompanying text.

## 2.    *There is Insufficient Evidence of a "Pattern" of Misconduct*

The Supreme Court in *Morrison* did suggest in a footnote that a more severe remedy might be appropriate even in cases where the harm is not irreparable, but where there is a pattern of misconduct.[187]  Although the State's conduct here was egregious, the evidentiary record does not sufficiently establish such a pattern of misconduct.

To the extent the trial court justified dismissal based upon the State's potentially similar misconduct in other cases, there is virtually no record evidence other than Ciritella's limited, ambiguous testimony on that issue.  His testimony sheds no light on when any such cell searches occurred, who was involved in any such searches, whether the State used a taint team, whether the search occurred during or was related to an ongoing case, whether the State notified opposing counsel or the court, and whether the legal paperwork that was seized was actually privileged.  Although, in this case, the State compounded its violation of Robinson's Sixth Amendment rights with its discovery failings and lack of fulsome disclosure to the Court and counsel, the record before us does not sufficiently establish "a pattern of recurring violations" of defendants' Sixth Amendment rights in criminal proceedings.

We are aware of the Superior Court's 2011 transcript ruling in *State v. Cannon*.[188]  In *Cannon*, unlike here, the State attempted to *avoid* intruding on the defendant's right to

---

[187] It noted that the record did "not reveal a pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter further lawlessness." *Morrison*, 449 U.S. at 365 n.2.

[188] Case ID No. 1001007728 (Del. Super. Ct. Jan. 3, 2011) (Ex. C to Opening Br.).  Both parties cite to several post-*Morrison* Sixth Amendment decisions in Delaware, namely: *Bailey*, *Cannon*, and *Puryear v. State*, 2000 WL 975055 (Del. May 30, 2000) (TABLE).  Those cases, however,

counsel by obtaining a search warrant that excluded attorney-client communications. Moreover, when the prosecutors learned that the detective had seized a notebook containing privileged information, they immediately and successfully took steps to prevent their exposure to the content of a notebook.[189] In fact, the Superior Court concluded that the investigating detective did not "knowingly, probably not even recklessly," violate the defendant's Sixth Amendment rights. The Superior Court followed this Court's approach in *Bailey v. State*[190] of fashioning "a remedy short of dismissal to match or meet the prejudice."[191] Based upon *Cannon's* distinguishable facts, it would be inaccurate to say that the State's conduct in *Cannon*, occurring more than eight years ago, along with its conduct in this case, constitute a "pattern" of misconduct sufficient to justify dismissal of Robinson's first degree murder indictment.

To be clear, we do not condone the State's misconduct. But given that we must carefully balance the competing interests of protecting the constitutional rights of defendants against the competing interests of all Delaware citizens (including victims and their families) in the administration of criminal justice, we conclude that the most extreme remedy possible, namely, dismissal, was unwarranted. A remedy less severe than dismissal

---

are factually distinguishable in important ways. First, in none of them did the State specifically target attorney-client privileged communications. Second, there was no indication that any member of the prosecution teams reviewed privileged material.

[189] *Cannon*, Case ID No. 1001007728, at 4–5, 7–8.

[190] 521 A.2d 1069 (Del. 1987).

[191] App. to Answering Br. at B141.

of Robinson's indictment can properly be tailored to ensure that Robinson's right to a fair trial is protected.[192] Accordingly, we reverse.

To eliminate what we perceive as a remote possibility of any taint or unfair advantage to the State, and as a sanction for the State's misconduct, we will require the disqualification of Downs, Denney, Prater, Grubb, Ciritella, Marvel, and Dempsey from participation in Robinson's trial, along with anyone else who has been exposed through review, discussion, or otherwise of Robinson's privileged materials. In addition, the State is required to destroy all trial work product developed thus far in this case. Notwithstanding the practical implications of these sanctions, this Court expects the State to proceed with appropriate dispatch given the delays that it has caused already in these proceedings.

## VII.    *Conclusion*

In sum, we affirm the trial court's conclusion that the State violated Robinson's Sixth Amendment right to counsel as a result of its wrongful and unjustified intrusion into his attorney-client privileged materials. But based upon our assessment of the record, and on our interpretation of *Morrison's* requirement that the remedy must be tailored to the harm, we reverse the Superior Court's dismissal of the indictment. Although the Superior Court has discretion to sanction litigants, it failed to tailor its remedy to the violation and

---

[192] For example, a new prosecution team with no exposure to this case could try the case without any potential threat to the fairness of the trial, particularly since this case was still in its pretrial stage. *See Singer*, 785 F.2d at 232 (denying motion to dismiss where the government knowingly gained access to the defendant's trial strategy, and instead limiting the possible taint by prohibiting the involvement of any government attorney or investigator previously involved and by appointing out-of-state federal prosecutors); *Quattlebaum*, 527 S.E.2d at 109 (reversing murder conviction and disqualifying prosecutor's office that intentionally eavesdropped on privileged conversations from participating in the defendant's retrial).

actual prejudice that it found. The trial court's dismissal of the indictment failed to adequately "preserv[e] society's interest in the administration of criminal justice."[193]

Make no mistake that we condemn the State's behavior. We warn the State that any further instances of such intentional misconduct may well lead to dismissal of the case in which the misconduct occurs, in addition to other possible sanctions.[194] We are troubled that even during this appeal, the State continued to trivialize the wrongfulness of its conduct.[195] In the event the State again invades a defendant's privileged materials, the State must bring to the trial judge's attention this Opinion for the purpose of factoring in this case in determining whether the State engaged in a pattern of misconduct.

The fairness of our judicial system is called into question by prosecutorial misconduct of the type that occurred here. Prosecutors are ministers of justice—not merely

---

[193] *Morrison*, 449 U.S. at 364; *see also United States v. Gonzalez*, 164 F.3d 1285, 1292–93 (10th Cir. 1999) (upholding the district court's finding that the government's conduct was the product of extreme bad faith, but concluding that the court abused its discretion in imposing the most severe sanctions of complete suppression of witnesses' statements for discovery violations since prejudice to the defendants was not irreparable).

[194] We do not mean to rule out the possibility of other possible sanctions for the wrongdoing here. Based upon the representations made to this Court during oral argument, we trust that the Attorney General is actively reviewing this matter and will ensure that measures are taken within the DOJ (including a departmental review of the conduct and development of appropriate policies and training) to ensure against further such misconduct.

[195] *See, e.g.*, Opening Br. at 23 ("Even if the State improperly intruded on the attorney-client privilege in this case and/or Robinson's seized documents contained 'defense strategy,' the court wrongly presumed prejudice."); *id.* at 38 ("[W]hile the State could have done things better in this case, as it conceded at the evidentiary hearing, nothing in the record supports the court's finding that Robinson suffered any prejudice."); Reply Br. at 11 ("As discussed in the State's opening brief, all witnesses testified that, while not perfect, the *ad hoc* screen was effective."); Oral Argument Video at 1:05, https://livestream.com/DelawareSupremeCourt/events/8570210/videos/187665632 ("[W]hile the procedure could have been better, it was ultimately effective.").

advocates.[196] "[T]he prosecutor 'represents all the people, including the defendant who was being tried,'" and "'[i]t is equally his duty to see that justice be done by giving defendant a fair and impartial trial.'"[197]

This Court bears ultimate responsibility for protecting the rights of the accused. And because "only this Court has the power and responsibility to govern the Bar,"[198] we also bear ultimate responsibility for upholding the high standards of professional conduct that we have established for lawyers practicing in this State. In order for our criminal justice system to function fairly, all of those charged with enforcing our laws must act within the confines of our constitutional boundaries. But in the rare case when that does not happen, as here, we are also charged with balancing the harm from such transgressions against the interests that all Delaware citizens (including victims of crime and their families) have in the fair administration of criminal justice and enforcement of our laws. As this Court has said concerning situations involving interference with the assistance of counsel, the remedy "should be tailored to the injury suffered and should not unnecessarily

---

[196] *See McCoy v. State*, 112 A.3d 239, 262 (Del. 2015) (recognizing that "a prosecutor has 'special responsibilities' as 'a minister of justice and not simply . . . an advocate'" (quoting Del. Lawyers' R. Prof'l Conduct 3.8 cmt. [1])); *see also* Del. Lawyers' R. Prof'l Conduct R. 4.4(a) ("In representing a client, a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of such a person."); *Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

[197] *McCoy*, 112 A.3d at 262 (quoting *Hooks v. State*, 416 A.2d 189, 204 (Del.1980)).

[198] *In re Infotechnology, Inc.*, 582 A.2d 215, 216–17 (Del. 1990).

59

infringe upon society's competing interest in the administration of criminal justice."[199]  For the reasons set forth above, we reverse the dismissal of the indictment.

We therefore AFFIRM in part and REVERSE in part the Superior Court's September 19, 2017 and May 1, 2018 opinions, and REMAND for further proceedings consistent with this Opinion.

---

[199] *Bailey*, 521 A.2d at 1084 (citations omitted).

**STRINE**, Chief Justice, concurring in part, dissenting in part, with **TRAYNOR**, Justice, joining:

We dissent in part from our colleagues' excellent opinion. Like our colleagues, we find the State's failure to acknowledge the wrongfulness of its conduct and the seriousness of its intentional, and furtive, violation of a defendant's Sixth Amendment rights disturbing and inexcusable.[200] Even on appeal, the State appears not to understand that what it did was wrong.

We also respect the majority's determination that dismissal was too severe a remedy. The decision of how to remedy a situation like this is difficult, especially when dismissal could result in the defendant being excused from culpability for a serious crime he may have in fact committed. But our trial courts must make difficult judgments like this, and the trial judge here grounded her dismissal order in the record evidence before her, informed by the precise arguments the parties made to her. Because, in our view, her remedial determination is reasonably supported by the record and justified by the seriousness of the misconduct it addresses, we would affirm.

To explain why we would affirm, we start with the way the parties themselves approached the issue before us. The Superior Court was faced with a motion to dismiss, and the State opposed that motion largely on the frivolous ground that its intentional and

---

[200] We agree and concur with our colleagues "that the State violated Robinson's Sixth Amendment rights and that he suffered actual prejudice." *Majority Opinion* at 48.

61

secretive invasion of the defendant's attorney-client communications was not a Sixth Amendment violation.[201] The State proposed no remedy for its breach at all.[202]

As our colleagues acknowledge, the Superior Court did not lightly grant dismissal, but considered the behavior of the State so problematic that it warranted a correspondingly severe remedy. One of the reasons why the behavior was problematic in a remedy-relevant way was that it was not novel and reflected a failure of the Department of Justice ("DOJ") to learn from past experience.

As the Superior Court found, one of the State's witnesses—the prosecution's chief investigating officer—testified that he had engaged in behavior of this kind before.[203]

---

[201] *See State v. Robinson*, 2018 WL 2085066, at *6 (Del. Super. Ct. May 1, 2018) ("The State argues that it was legally justified to conduct an independent and unauthorized search, seizure, and review of Defendant's attorney-client communications. Specifically, the State contends that it was not obligated to seek a warrant for its search because inmates have no Fourth Amendment protections in prison cells."); App. to Opening Br. at A717 (State's Answering Post-Hearing Brief (Jan. 26, 2018)) ("[T]he State did not purposefully intrude upon confidential communications between Robinson and his attorney.").

[202] App. to Opening Br. at A723–30 ("Thus, even assuming a Sixth Amendment violation, Robinson fails to establish that he suffered prejudice of any kind, either transitory or permanent, to the ability of his counsel to provide adequate representation in these criminal proceedings or to his right to receive a fair trial. There is thus no factual basis supporting the drastic relief [dismissal] sought by Robinson.").

[203] *Robinson*, 2018 WL 2085066, at *14 ("[A] State's witness testified that he has previously conducted similar searches targeting a defendant's legal documents in other cases."); *see also* App. to Opening Br. at A500 (Chief Investigative Officer Ciritella's Testimony (Oct. 25, 2017)) ("Q: Have you ever done a search like this before. A: Yes, sir. Q: So let me be specific. Have you done a, I am going to call it a seizure and review of an inmate's legal paperwork? A: Yes. Q: Okay. And I don't want you to say case name, or anything. To your knowledge, were those pursuant to a search warrant, or anything like that? A: No sir, they were not."); *id.* at A501–02 ("Q: So if a person is not supposed to have their police reports, they have their police reports anyways and you found them in cells? A: You're asking if I have ever done it before. Yes, I have. But there's other documents that I also look for. Q: Okay. Before the Jacquez Robinson review that you conducted, how many times would you say that you looked through documents from cells of inmates looking for things that may have violated a protective order? A: I think maybe one other time.").

Perhaps because the DOJ acted in the same deceptive manner that characterized its behavior here, that prior invasion, or perhaps incursion, was not caught or called out. To our minds, it was not the trial judge's job to open the record for the State to show that its actions were, taken over time, aberrational, when its own witness said that what they did in this case was a repeat of past behavior. This evidence of recidivist invasions of the attorney-client relationship is particularly troubling because the Superior Court already addressed analogous, if far less extreme, behavior in *Cannon v. State*. In *Cannon*, the State inadvertently seized attorney-client privileged materials from a defendant's cell after obtaining a search warrant to seize certain other items from the cell. Because the State promptly alerted the trial court to the violation and immediately returned the attorney-client privileged material, the Superior Court found that the appropriate remedy was to limit the testimony of the individual who saw the attorney-client material.[204] But the Superior Court did suggest that a "process [ ] be developed if it has not been already so that in the future we don't find ourselves in a similar situation."[205] Despite the warning in *Cannon*, the State nonetheless proceeded blithely and aggressively in this case. The trial judge was well within her discretion to be concerned that the DOJ did not respond to *Cannon*'s admonition appropriately and, worse yet, continued to be insensitive to the impropriety of its behavior.

As to this point, the majority elides an issue that the trial judge likely found telling. Upon learning that Robinson's legal materials had been taken from his cell, his attorney

---

[204] *See State v. Cannon*, No. 1001007728, slip. op. at 12–13 (Del. Super. Ct. Jan. 3, 2011); *see also* Exhibit C to Opening Br. at 12–13.

[205] *See Cannon*, slip. op. at 7; *see also* Exhibit C to Opening Br. at 7.

immediately alerted the Superior Court and requested that the materials be returned.[206]

Once this came to the Superior Court's attention, the trial judge requested a prompt response from the State and received two letters. The first, from the lead prosecutor, failed to acknowledge the prosecution's role in the seizure of Robinson's papers and merely stated that "I have been advised that materials taken from Robinson's cell has [sic] already been returned or will be returned to him today."[207] Without the second letter from the Department of Correction ("DOC") advising the Superior Court that "[a]t the request of Department of Justice investigators, the DOC did conduct a search of Robinson's cell on June 30, 2017, and did remove materials from his cell, including legal materials," the Superior Court—and Robinson—might never have learned the full story about the State's unlawful behavior.[208] This lack of candor from the criminal division of the DOJ underscores the concerns the Superior Court cited as motivating the severity of its remedy.[209]

This lack of candor extends to other aspects of the record and also has the effect of undercutting the confidence the Superior Court could have in crafting an alternative

---

[206] App. to Opening Br. at A71–72 (email from Natalie Woloshin to Judge Parkins et. al. (July 5, 2017)) (alerting the court to the fact that on June 30, 2017 Robinson's materials were taken from his cell and requesting the court take action to protect Robinson's right to counsel).

[207] *Id.* at A114 (email to Judge Parkins from John Downs (July 7, 2017)).

[208] *Id.* at A117 (letter to Judge Parkins from Gregory Smith (July 7, 2017)).

[209] *Robinson*, 2018 WL 2085066, at *13 (observing that "[t]he State's conduct was also in direct conflict with the fundamental role and duty of prosecutors"); *id.* at *14 ("The State has ignored the fundamental importance of the Sixth Amendment right to the assistance of counsel and the attorney-client privilege, has demonstrated a disregard for Defendant's constitutional rights, and has exhibited a cavalier approach to the proceedings addressing its conduct.").

remedy—a remedy the trial judge considered, despite the State's failure to propose any remedy, and specifically rejected.[210] For example, the State failed to produce all relevant documents even after the trial court ordered their production.[211] After producing only three emails and two-pages of handwritten notes, the State asserted that these were "the entirety of the documents that exist discussing the search and seizure that the Court had ordered."[212] But at an October hearing, the trial judge was surprised to learn that a witness had not been instructed to search for emails related to this case per the court's prior order.[213] The Superior Court again ordered the State to produce these documents,[214] and after completing

[210] *Id.* at *16–17 ("Although the State has not even suggested an alternative remedy, the Court has considered, for example, requiring that all members of the Prosecution Team be replaced on any of the cases involving Defendant and that any work product they developed be destroyed so that a new prosecution team would have to develop a new strategy without any taint from the Protective Order Investigation . . . . This Court concludes, after careful review of the record and after much consideration, that these remedies are inadequate because the prejudice to Defendant is much broader, and the affront to the rule of law is more profound, than can be addressed by these limited remedies.").

[211] *See State v. Robinson*, 2017 WL 4675760, at *6 (Del. Super. Ct. Sept. 19, 2017) ("As a starting point, the State must respond to Robinson's Motion Counsel's request for production of documents."); *id.* at *6 n.43 ("The Court addressed discovery in its August 21, 2017 office conference. Presumably, all relevant documents have already been produced, including email messages discussing the search and seizure. If said production has not yet taken place, the State shall produce documents responsive to Motion Counsel's request within five (5) business days of this order."); *see also* App. to Opening Br. at A226 (Reply to State's Answer to Defendant's Motion to Dismiss (Aug. 11, 2017)) (requesting production of "all communications between the DOJ and DOC regarding the seizure and review of the legal documents produced" and "any memoranda, notes, or other documents drafted by the review team be produced"); *id.* at A277 (Office Conference (Aug. 21, 2017)) (the Superior Court ordering a production hold on all e-mails and text messages).

[212] App. to Opening Br. at A284 (Transcript of Court Decision (Sept. 26, 2017)).

[213] *Id.* at A577 (Transcript of Hearing (Oct. 25, 2017)) ("THE COURT: . . . [T]he Court expected that the State would produce all of the documents responsive to [defense counsel's] requests.").

[214] *Id.* at A576 ("THE COURT: . . . But the other piece of information that surprised me today was [the paralegal's] testimony that she had not done an e-mail search, and that she had not been asked to do a e-mail search. I think that is inconsistent with what my expectation were, because

a proper search, the State produced more than 37 additional, relevant documents.[215] Attorneys, as officers of the court, should take any command from the court seriously, and especially in a case about potential constitutional violations, the State's failure to promptly and thoroughly comply with a court order is alarming and undercuts our confidence in the State's ability to implement a "clean team" solution.

But this was not the only instance in which the State failed to adhere to the Superior Court's commands. Despite prior instructions from the trial court to have "all of the people who reviewed [Robinson's] documents" testify at an October hearing,[216] the State failed to produce an investigator who, along with the chief investigator, initially reviewed Robinson's documents at the jail.[217] Because of the State's failure to follow the trial judge's earlier command to have everyone involved testify, she held another hearing a month later to hear from this missing witness.[218] In this instance, the State not only failed to comply with the Superior Court's earlier command, but also delayed the resolution of this case by at least a month because the trial court had to schedule another hearing to complete the record. And the State's continued insistence, both below and on appeal, that the prosecution's paralegal who reviewed Robinson's legal materials did not participate in

---

[defense counsel], I think, made a request for documents."); *id.* at A578 ("THE COURT: . . . I want the e-mail search done if it hasn't been done, and I want all of the documents produced.").

[215] *See* App. to Answering Br. at B59–60 (Letter from the State to Judge Rocanelli (Nov. 16, 2017)).

[216] App. to Opening Br. at A505 (Transcript of Hearing (Oct. 25, 2017)).

[217] *Id.* at A502.

[218] *See generally id.* at A582–661 (Transcript of Hearing (Nov. 21, 2017)).

the case after she reviewed the documents,[219] evidences a combination of less than ideal candor, a failure to "get it," and a mindset that cuts against reposing undue confidence in the DOJ to faithfully implement a more tailored remedy. The record is indisputable that the paralegal continued to be included in all of the trial team's e-mail traffic about the case until at least July 7, 2014[220] and "was not officially removed from the prosecution team until July 14, 2017, after the Court continued the [originally scheduled] July 11 scheduled trial."[221] If the criminal division took *Cannon* seriously, it is difficult to understand why the paralegal was not immediately removed from all distribution lists, formal instructions were not given to exclude her from all communications regarding the case, and a stringent clean team approach was not implemented. Instead of conjuring up a clean team remedy on its own initiative, a remedy that would not have been supported by any reasoned input or suggestions from the DOJ and that would require the faithful and diligent

---

[219] *See, e.g.*, Oral Argument at 2:21–30 ("She [the paralegal] did not participate in actively in the case after her review of the records."). Answering Br. at 15–16; App. to Opening Br. at A711–12 (State's Answering Post-Hearing Br. (Jan. 26, 2018)); *id.* at A722–23 ("Although [the paralegal] did have access to the seized materials, the evidence---affidavits and hearing testimony— establishes that [the paralegal] did not discuss with or pass on any details or information regarding Robinson's trial plans, strategy, or the contents of anything that was found in Robinson's cell to the trial prosecutors. [The paralegal] communicated her findings exclusively to [the Chief Investigator] and the [Chief Prosecutor]. [The paralegal] has been removed from this case and will not provide any assistance to the prosecutors.") (footnote omitted).

[220] *See generally* App. to Answering Br. at B61–132 (State's Final Response to Order for Production (Nov. 16, 2017)).

[221] *Robinson*, 2018 WL 2085066, at *6 (footnote omitted); *see also* App. to Answering Br. at B44–45 (email from John Downs to Judge Parkins (July 7, 2017)) (discussing jury instructions and copying the paralegal on the email after she had reviewed Robinson's documents); *id.* at B64 (email from John Downs to Jamie Prater et. al. (July 14, 2017)) (removing the paralegal from the prosecution team); *id.* at B94 (email from Jamie Prater to John Downs (July 6, 2017)) (discussing the case after the paralegal had reviewed the documents).

implementation by an organization (the DOJ) that did not seem to believe it did anything wrong, the Superior Court decided that granting the motion to dismiss was the most equitable and sufficient option to remedy the State's serious misconduct. Given this record and the State's failure to propose any viable remedy, we should not second-guess the Superior Court's conclusion that dismissal was appropriate.

Our friends in the majority are right that dismissal has been said to be a disfavored remedy.[222] But this is not a case about an isolated piece of evidence that the State got improperly and could be remedied by exclusion at a new trial. This is a case where the State gained access to the defendant's trial strategy,[223] did so secretly, did not come clean when caught, did not exclude a key professional from the trial team until over a week after the violation, and when called to account by the Superior Court, responded in a seemingly guileful and inept manner. For these reasons, we fully understand and cannot fairly second-guess the trial judge's view that crafting some sort of "clean team" remedy going forward would not only fail to deter the State from repeating its admittedly already repetitious behavior, but would require the court to repose confidence that the same group of people who still fail to "get it" would implement with fidelity and skill a clean team remedy.[224]

---

[222] *See, e.g. Morrison v. United States*, 449 U.S. 361, 365 (1981) (referring to dismissal as a "drastic" remedy).

[223] During the two evidentiary hearings and briefing below, the State did not argue that its investigators did not come upon Robinson's trial strategy during its review of Robinson's attorney-client communications. And at oral argument in this Court, the State confirmed that it cannot dispute the Superior Court's factual finding that the document review disclosed Robinson's trial strategy. Oral Argument at 20:47–21:23.

[224] *Robinson*, 2018 WL 2085066, at *16–17 ("Although the State has not even suggested an alternative remedy, the Court has considered, for example, requiring that all members of the Prosecution Team be replaced on any of the cases involving Defendant and that any work product

Forging a clean team solution in any situation like this is challenging; doing so when the organization that has to execute it has not proposed a viable approach of its own, fundamentally does not believe it did anything wrong, and already fumbled its first try at something like it is an exercise necessarily fraught with risk. The trial judge's decision that this risk should not be imposed upon the defendant at the instance of the party whose wrongful conduct gave rise to the problem needing solution—and the party that never proposed any alternative solution—is reasonable and deserves respect.

So too is the trial judge's view that without a stringent remedy the State has poor incentives to improve its behavior.[225] In a future case, perhaps the State won't be caught. And if it is, it can just insist that there is no harm, and propose no remedy. Even if it loses on that argument, it will get a do over with a new trial team.

This case is like a football team secretly stealing the other team's game plan, not being honest about it when caught, and asking for the game to be played at a later time on a "just trust us, the folks who read your game plan will not be involved" basis. Except that the stakes here involve a criminal defendant's trial strategy and if the game is played later,

---

they developed be destroyed so that a new prosecution team would have to develop a new strategy without any taint from the Protective Order Investigation . . . . This Court concludes, after careful review of the record and after much consideration, that these remedies are inadequate because the prejudice to Defendant is much broader, and the affront to the rule of law is more profound, than can be addressed by these limited remedies.").

[225] *Id.* at *17 ("The constitutional rights of criminal defendants must be respected by the State and the rule of law demands accountability of prosecutors to the Court. The nature of the violations of this Defendant's Sixth Amendment right to the effective assistance of counsel require dismissal of the Indictment because any lesser sanction would unduly depreciate the seriousness of the State's actions and the extent to which the State's actions put at risk the most fundamental constitutional protections.") (footnote omitted).

the defendant will not only face a serious delay in his trial and the corresponding staleness in memories of witnesses, but the quite rational concern that in fact the State's prosecution team will have benefited from having access to his trial strategy and can use that access to improve its chances of convicting him.

In this case, the State itself created the stark choice the trial judge faced. Its obstinacy, lack of forthrightness, and failure to propose a confidence-inspiring remedy, or any remedy at all, was its own choice. Confronted with the record the parties created, the trial judge made a tough and well-reasoned decision to remedy serious misconduct with a correspondingly serious remedy. We would affirm.